CONSOLIDATED DATA TERMINALS, a California corporation, Plaintiff,

v.

APPLIED DIGITAL DATA SYSTEMS, INC., a corporation, Does 1 through 25, Defendants.

Civ. No. C 79 0207 SW.

United States District Court, N. D. California.

Feb. 24, 1981.

Richard L. Perez and Jeffrey Alan Miller, Lempres & Wulfsberg, Oakland, Cal., for plaintiff.

Craig H. Casebeer, Cooley, Godward, Castro, Huddleston & Tatum, San Francisco, Cal., for defendants.

## FINDINGS OF FACT

DANIEL HOLCOMBE THOMAS, Senior District Judge, sitting by designation.

1. Plaintiff Consolidated Data Terminals (hereafter CDT) is a corporation engaged in the distribution of various computer terminals, including cathode ray tubes (hereafter CRTs).

2. Defendant Applied Digital Data Systems, Inc. (hereafter ADDS) is a corporation engaged in the manufacture of computer equipment, primarily CRTs.

### A. *The Agreement*

3. In December 1976, CDT and ADDS entered into a written Distributorship Agreement (hereafter Agreement) whereby CDT became a non-exclusive distributor of ADDS' products. (Plaintiff's Exhibit 1). ADDS had recently begun to use distributors to promote its products, having previously engaged only in direct sales. As a distributor, CDT was not a "user" of the ADDS' products, but was solely engaged in selling the equipment.

4. Herbert Williams, president of CDT, had prior dealings with ADDS and relied in part upon these experiences in forming his understanding of the Agreement. He requested several changes in the terms of the Agreement and such changes were incorporated into the final Agreement.

5. There was no material disparity in bargaining power between ADDS and CDT with respect to the Agreement.

### B. *Customer Leads and Inquiries*

6. Pursuant to the Agreement, ADDS agreed to provide CDT "from time to time, inquiries and leads received from prospective customers located within the geographic areas covered by (CDT)." (Plaintiff's Exhibit 1, ¶ 19). Sales leads are customarily provided by a manufacturer to the distributor and prove a vital factor in helping develop the distributor's market.

7. ADDS received a small volume of end-user leads in the San Francisco Bay area during 1977 and 1978. Of these, many were retained by ADDS' direct salesmen. CDT received less than twenty customer leads from ADDS during this entire period, although it received as many as 100 per month from other companies. CDT made periodic requests of ADDS and, in particular, of Jim Fleury, ADDS' direct salesman in the Bay area, and in charge of the CDT account, for additional leads.

### C. *Consequential Damages Limitation*

8. In the Agreement, ADDS agreed to accept purchase orders from CDT "under the terms and conditions of Schedule B" which was made a part of the Agreement. (Plaintiff's Exhibit 1, ¶ 5). Schedule B contains the "Terms and Conditions of Sale" and includes the following paragraph:

6. WARRANTY

ADDS warrants each new communications and terminal product manufactured by it to be free from defects in material and workmanship under normal use and service for a period of 90 days from the date of shipment. ADDS' sole obligation under this warranty is limited to making good, at its factory, any product or any part or parts thereof found to be defective, provided the Buyer bears the cost of shipping charges in connection with the repair or replacement of the defective equipment. ADDS MAKES NO WARRANTY, EXPRESS OR IMPLIED, AND ANY IMPLIED WARRANTY OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WHICH EXCEED THE FOREGOING WARRANTY IS HEREBY DISCLAIMED BY ADDS AND EXCLUDED FROM ANY AGREEMENT MADE BY ACCEPTANCE OF ANY ORDER PURSUANT TO THIS AGREEMENT. ADDS will not be liable for any consequential damages, loss or expense arising in connection with the use of or the inability to use its products for any purpose whatever. ADDS' maximum liability shall not in any case exceed the contract price for the products.

### D. *Salesmen's Compensation*

9. Pursuant to the Agreement, ADDS agreed to "credit the responsible ADDS territory salesman per the current ADDS Marketing Compensation Plan" for sales made by the distributor. (Plaintiff's Exhibit 1, ¶ 14). ADDS did not give its salesmen a direct monetary interest in their distributors' sales as agreed upon. As a result, ADDS' direct salesmen pursued many small leads themselves rather than providing these leads to the distributor.

### E. *The Business Agreement*

10. ADDS agreed to support CDT as a distributor of its products, in particular by maintaining a larger profit margin on its products than was usual in the industry.

11. ADDS enjoyed a reputation in the industry prior to 1978 for manufacturing high-quality, reliable products.

### F. *Pricing and Markets*

12. ADDS maintained separate price lists for original equipment manufacturers (hereafter OEM), end-user and distributor sales and agreed to sell according to the appropriate price lists. The Agreement called for the Distributor to sell ADDS products at these prices.

13. For any given quantity, ADDS' end-user products were higher than either OEM or distributor prices; the OEM price varied, but was higher than the distributor price until reaching or exceeding the 500 unit OEM price, at which time the OEM price was lower than the distributor price.

14. To qualify for ADDS' OEM price, the purchaser must be an "original equipment manufacturer" or a "service bureau" as defined in Plaintiff's Exhibit 54.

15. ADDS expected the distributor to confine itself to small OEMs or to the end-user market. ADDS, however, competed with its distributors, including CDT, for small OEM and any end-user sales through its direct salesmen.

### G. *The Regent Terminals*

16. The Regent 100 and 200 terminals were first sold by ADDS to CDT in November or December 1977, after having been introduced into the trade in July 1977. These terminals were complex, sophisticated electronic equipment, which embodied technology new to CRTs.

17. ADDS represented that both terminals would operate at 19,200 baud (1920 characters per minute) when in fact none of the terminals would operate to these specifications. When introduced, the terminals did not operate properly at any level above 4800 baud and occasionally did not work properly at 1200 baud.

18. Of the terminals delivered to CDT, as many as 100% in a delivery were defective in some way, with as many as 25% being "DOA" or "dead on arrival" (inoperable).

19. ADDS attempted to repair the terminals found to be defective by sending a special team of engineers to customer sites on one occasion, and by setting up a repair depot to which a customer could ship the defective equipment in order to retrofit and upgrade the equipment. This repair and upgrading was performed at no charge to the customer and beyond the 90 day warranty period; however, the customer was charged with the shipping cost to and from the repair depot.

20. ADDS continued to sell and deliver the terminals to CDT even after many of the problems had been discovered and while knowing that the terminals continued to have problems and did not operate according to specifications. The production line of ADDS terminals did shut down on several occasions in 1978 for a few days at a time in an effort to solve the problems but would resume without completely accomplishing this purpose. ADDS continued to represent to CDT that its attempts to repair the defective units were, or would be successful.

21. Although it is common in the industry that newly introduced equipment experience some operational problems during the initial weeks or months of production, the problems with the Regents continued beyond this time. The Regent 100 and 200 product lines suffered from design defects resulting in numerous and continuing malfunctions, including, but not limited to, the

inability to perform according to specifications, which rendered the terminals basically inoperable. ADDS failed to solve these problems until the fall of 1978. Even then the terminals did not perform to the original specifications, but rather the specifications had to be modified to a lower baud rate.

22. The Regent defects caused CDT to incur $15,000.00 in additional costs and lost profits because of the numerous service calls which they necessitated.

23. The Regents' defects and failure to operate according to specifications had substantially adverse effects of CDT's ability to sell ADDS' products.

24. CDT's actual sales of ADDS equipment for the first nine months of 1978 totalled $103,125.00.

### H. *The Intel Transaction*

25. In December 1977, ADDS, with Jim Fleury as salesman, sold Regent 100's to Intel as an end-user based upon the understanding that the terminals were for Intel's internal use. (Plaintiff's Exhibit 20).

26. The Intel order in June 1978 was to be a large-end-user sale for which ADDS, CDT and other companies made bids. ADDS first quote to Intel was at its standard end-user price with volume discount and was based on the understanding that the terminals were to be used for the same purpose as those sold to Intel in December 1977. CDT did not regard itself as being bound by any agreement as to the price it could resell ADDS equipment and its bid was $45 per unit below the standard ADDS end-user price with volume discount.

27. Intel notified CDT that it was the successful bidder and notified ADDS that its bid was too high. Soon after, ADDS' salesman, Jim Fleury, spoke with CDT's salesman, Douglas Cole, regarding the bidding and was told that CDT was the successful bidder and was also told the amount of CDT's bid.

28. ADDS' Western Regional Manager, John Witherow, authorized Jim Fleury to submit to Intel a second quote, using lower OEM prices. (Plaintiff's Exhibit 24).

ADDS had the same basic information as it had on the December sale regarding Intel's internal use of the equipment, but Jim Fleury spoke with Steve Abreu, Intel's site purchasing manager, about qualifying Intel as a service bureau and, thus, qualifying Intel for OEM prices. Leland Fong, Intel's communications analyst, testified that Intel does not sell or rent computer time to outside parties, but does provide time to its various departments. On this basis and on the basis of Intel's providing ADDS with a resale number, ADDS determined Intel to be a service bureau. Abreu testified that this transaction was out of the ordinary for Intel, was handled differently and that at the time, he did not believe Intel was an OEM.

29. ADDS successfully sold to Intel, which it would not have done without lowering its prices, knowing in fact that this was an end-user sale. ADDS did so in order to take the sale from its competition which, by most favorable testimony, it knew was an ADDS' distributor or, by least favorable testimony, it knew was CDT. By making the sale, Jim Fleury would receive a larger commission than by indirectly selling to CDT. ADDS, too, would receive greater compensation by selling to Intel at OEM prices rather than to a distributor at distributor's prices.

30. The net profit (including fixed overhead) CDT would have earned had it sold ADDS equipment to Intel in July 1978 was 127 units times the profit margin of $266.00, or $28,702.00.

### I. *Termination of the Agreement*

31. CDT's final purchase of ADDS equipment occurred in March 1978. In April or May 1978, it stopped promoting the sale of the equipment to new customers and stopped ordering equipment. At that time, CDT looked to Lear Siegler as its primary terminal supplier. Prior to this time, CDT had performed under the Agreement in all respects.

32. CDT finally stopped selling ADDS products completely in July 1978 following the Intel transaction because of the contin-

uing problems with the Regents, ADDS' failure to provide leads, ADDS' competition in all aspects of the market, ADDS' failure to properly motivate its salesmen to aid distributors and ADDS' conduct in the Intel transaction. CDT entered at that time into an agreement to distribute Hazeltine products to replace the ADDS line of terminals which it had stopped selling.

### J. Damages

33. The projections of sales of ADDS equipment placed into evidence by CDT (Plaintiff's Exhibit 53) are based on the assumption that the Regent terminals operated properly and to specifications, that CDT received support from ADDS, that CDT received additional customer leads from ADDS and that ADDS gave no direct competition to CDT in the end-user and small OEM market.

34. ADDS failure to provide high quality and reliable products, its failure to provide leads and cooperation and its marketing of defective and substandard terminals deprived CDT of the following projected net profits:

| 1978 | $ 28,935 |
|------|----------|
| 1979 | 35,040 |
| 1980 | 58,180 |
| 1981 | 66,450 |
| 1982 | 68,160 |
| | $256,765 |

CDT offered no evidence of any damages suffered for the year 1977.

### K. Mitigation and Cover

35. CDT became a distributor of Hazeltine terminals in July 1978, after it had stopped selling ADDS terminals. The dollar amount of sales by CDT of Hazeltine products in 1978 totalled $37,500.00. In 1979 this total rose to $136,250.00. Projected sales for 1980 are $187,500.00 and for 1981 are $237,500.00.

36. In 1979, CDT became a distributor of Televideo terminals. The dollar amount of sales of Televideo terminals by CDT in 1979 totalled $136,250.00. CDT projected that it would sell 1,000 units in 1980 at $735.00 per unit, or $735,000.00, 1200 units in 1981 and 1500 units in 1982.

37. CDT continued as a distributor of Lear Siegler products. The dollar amount of sales of Lear Siegler products by CDT during fiscal 1978 totalled $574,000.00. In 1979, that total rose to $1,121,250.00. CDT projected sales in 1980 to be 1500 units at $1,100 per unit, or $165,000.00; in 1981, to be 1750 units and in 1982, to be 2000 units.

### L. The Counterclaim

38. CDT has not paid ADDS $61,172.17 for products received from ADDS, on which ADDS seeks interest from December 26, 1978.

## CONCLUSIONS OF LAW

### A. The Agreement

1. The Agreement is governed by the law of New York, as specified by the parties in the Agreement. *Michael v. SS THANASIS*, 311 F.Supp. 170, 177 (N.D.Cal. 1970).

2. The tort claims are to be decided according to California law.

### B. Customer Leads and Inquiries

3. ADDS failure to provide leads affected CDT's ability to sell ADDS' products, but this failure did not provide a material breach of the Agreement.

4. CDT is foreclosed from seeking damages under the Agreement beyond those damages proximately caused by the failure to provide a sufficient number of leads and inquiries.

### C. Consequential Damages Limitation

5. The limitations on remedy contained in Paragraph 6 of Schedule B are applicable only to defects in materials and workmanship affecting only isolated units and does not apply to design defects suffered by the Regent 100 and 200 CRTs which rendered the entire product line defective.

6. Paragraph 6 of Schedule B was intended to apply to users of the ADDS' products and is inapplicable to CDT's claims because CDT was a distributor and not a user of the ADDS' products.

### D. Salesmen's Compensation

7. ADDS' failure to provide its salesmen with an adequate financial interest in its distributor's sales affected the business relationship between the ADDS' salesmen and the distributors but this failure did not constitute a material breach of the Agreement.

### E. The Business Agreement

8. ADDS provided minimal support to CDT as a distributor of its products.

9. Neither the Regent 100 nor the Regent 200 was inherently reliable.

### F. Pricing and Markets

10. The distributor of ADDS' products could not be compelled to sell according to the price schedules established by ADDS and any failure to follow the pricing schedules of the manufacturer is not a breach of the Agreement.

11. The Agreement did not address itself to the markets to which either ADDS or CDT was to confine its selling efforts. Presumably, the manufacturer and the distributor would work in harmony and not compete directly against each other.

### G. The Regent Terminals

12. The Court finds that the Regent terminals were negligently designed, introduced and sold. With reasonable care and diligence, ADDS would have known that it was manufacturing and selling equipment which did not operate according to the published specifications.

13. Knowing that the Regent line was having operational problems which were not "fixed", ADDS continued to sell and deliver Regent 100's and 200's to CDT, fraudulently representing that the terminals were inherently reliable.

### H. The Intel Transaction

14. Nothing in the Agreement prevented ADDS from competing with CDT for the Intel order in the initial bidding. The Court finds, however, that in regard to the events leading to the second ADDS' bid and its subsequent acceptance, ADDS wrongfully interfered with CDT's economic relationship with Intel.

### I. Termination of the Agreement

15. The Court finds that the Agreement was effectively terminated in the first week in July 1978, following the disputed Intel transaction.

### J. Damages

16. ADDS is liable for the damages its negligent design, introduction and sale of the Regents and its fraudulent conduct in regard to the Regents caused CDT in additional costs. The Court finds these costs to be $15,000.00. In addition, the Court finds that a reasonable time for the duration of the agreement to be three years rather than five. The Court further finds that CDT's projected sales for the year 1978 must be reduced by the amount of actual sales. CDT projected sales of $289,350.00 for the year 1978. This figure must be reduced by the actual sales of $103,125.00 or $186,225.00. Therefore, the net profit for the year 1978 which was not achieved would be $18,622.50. This is derived from Williams' testimony that CDT's profit margin was 10% of sales. The Court finds that the CDT's loss of profits for the years 1978–1980 inclusive, to be $111,842.50, for which ADDS is liable.

17. ADDS wrongful interference with CDT's advantageous economic relationship with Intel proximately damaged CDT in the sum of $28,702.00, for which sum ADDS is liable.

18. The Court finds that ADDS' fraudulent conduct and wrongful interference with CDT's advantageous economic relationship with Intel was in knowing and conscious disregard of CDT's rights and interests and entitles CDT to recover punitive damages from ADDS in the amount of $500,000.00.

### K. Mitigation and Cover

19. The Court finds that neither the Hazeltine products nor the Televideo products were competitive in price or in actuality with the ADDS' products during

the years 1978–1980, inclusive. The Court therefore finds that the sales of these products have no mitigating or covering effect in regard to CDT's lost profits from the sales of ADDS' products. The Court further finds that the sale of Lear Siegler products has no effect in the mitigation or cover of CDT's lost profits because CDT was never prohibited from selling such products while an ADDS' distributor.

### L.   *The Counterclaim*

20.   ADDS is entitled to a set-off against the amounts it owes CDT in the sum of $61,172.17, plus interest at the rate of 7½% per annum from the filing of this action on December 26, 1978, until the date of this Judgment, for a total of $70,054.89.

21.   In summary, the Court holds that CDT is entitled to recover against ADDS the following elements of damage:

| | | |
|---|---|---|
| 1. | Additional costs incurred | $ 15,000.00 |
| 2. | Lost profits | |
| | a.  Year 1978 | 18,622.50 |
| | b.  Year 1979 | 35,040.00 |
| | c.  Year 1980 | 58,180.00 |
| | d.  On Intel transaction | 28,702.00 |
| 3. | Punitive damages | 500,000.00 |
| | Total | $655,544.50 |

22.   In light of the counterclaim of ADDS, the Court makes the following allocation of damages:

| | | |
|---|---|---|
| 1. | Amount of Judgment | $655,544.50 |
| 2. | Less counterclaim plus interest at 7½% from date of filing to date of Judgment | − 70,054.89 |
| 3. | Judgment against ADDS | $585,489.61 |

### SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 5, 1980, this Court entered a Judgment in favor of plaintiff, Consolidated Data Terminals (CDT), and against the defendant, Applied Digital Data Systems, Inc. (ADDS), in the amount of $655,544.50. On December 15, 1980, ADDS filed a motion pursuant to Federal Rules of Civil Procedure 59 to alter or amend the judgment and for a new trial. ADDS moved to reduce the judgment in the amount of $528,702.00; $28,702.00 representing the compensatory damage award for lost profits for wrongful interference with ADT's advantageous economic relationship with Intel, $500,000.00 representing the punitive damage award for that wrongful interference and fraudulent conduct. ADDS alleges that such a finding of wrongful interference is predicated on a finding of breach of contract which is, as a matter of law, violative of the antitrust laws and is unenforceable. Alternatively, ADDS seeks a new trial with respect to the punitive damage award. Defendant ADDS also seeks a new trial on the ground that the punitive damage award is excessive.

A motion under Rule 59(a) is intended to correct manifest errors of law or fact or to present newly discovered evidence. *Evans, Inc. v. Tiffany & Co.*, 416 F.Supp. 224 (N.D.Ill.1976). Under this rule, a district court may make supplemental findings and modify the judgment originally entered. *McCraw v. Simpson*, 141 F.2d 789 (10th Cir. 1944). The Court, therefore, makes the following supplemental findings of fact and conclusions of law:

1. This Court in its original Findings of Fact and Conclusions of Law entered December 5, 1980, made the following finding:

12. ADDS maintained separate price lists for original equipment manufacturers (hereafter OEM), end-user and distributor sales and agreed to sell according to the appropriate price lists. The Agreement called for the Distributor to sell ADDS products at these prices.

Defendant ADDS takes issue with this finding and in particular with the phrase "agreed to sell according to the appropriate price lists." ADDS argues that enforcement of such an "agreement" would be in violation of the antitrust laws.

Generally a party who has litigated the case under one theory is not permitted to reopen the case under Rule 59 in order to introduce evidence in support of another legal theory or in support of issues not raised by that party at trial. *Bell Telephone Laboratories, Inc. v. Hughes Aircraft Co.*, 73 F.R.D. 16 (D.Del.1976). Because the Court spoke of this "agreement" in its Find-

ings of Fact, it will examine Defendant's antitrust argument.

Both parties maintain, and this Court finds, that there was no *formal* agreement between ADDS and CDT that ADDS would sell according to the appropriate price lists. To require that ADDS do so would indeed be a violation of the antitrust laws, just as it would be for ADDS to enforce that part of the Agreement which required CDT to sell at those listed prices. The "agreement" of which the Court spoke was rather the announced practice of ADDS to sell at the listed prices, such as a manufacturer's suggested price list.

ADDS was not held liable for not complying with a formal "agreement" as counsel for ADDS suggests. The antitrust defense of ADDS fails.

2. This Court in its Findings of Fact and Conclusions of Law also made the following conclusion:

14. Nothing in the Agreement prevented ADDS from competing with CDT for the Intel order in the initial bidding. The Court finds, however, that in regard to the events leading to the second ADDS' bid and its subsequent acceptance, ADDS wrongfully interfered with CDT's economic relationship with Intel.

ADDS argues that a competitor is free to attempt to "interfere" with a prospective relationship as long as the methods employed are not wrongful. ADDS further argues that there can be no finding of wrongful interference with the economic relationship if it only knowingly violated an agreement to sell at a certain price.

ADDS was free to engage in competition for the Intel order, even though its main competition was its own distributor. ADDS was free to submit a lower bid than CDT in order to secure the order and was also free to lower that bid to obtain the sale as long as the lower bid was submitted before any bid was accepted. The facts of this case, however, indicate that ADDS did not interfere with a "prospective" relationship, which it was certainly entitled to do, but rather it interfered with an "actual" relationship between CDT and Intel. CDT had

been notified it was the successful bidder and this information was relayed to ADDS before ADDS submitted a second quote to Intel. See Findings of Fact 27, 28. The economic relationship between CDT and Intel with which ADDS interfered was established at the acceptance of CDT's bid by Intel and occurred before ADDS' second bid which ultimately proved successful.

It is this conduct which this Court found as wrongful interference. This conduct does not "fall squarely within the privilege of competition" because the competition for the bid no longer existed since the bid had been awarded. ADDS conduct was improper, not because it sold below its announced prices, but because of the manner in which ADDS took the sale from CDT.

3. Making the second bid did not constitute a breach of any agreement with CDT to sell at certain prices. There was no agreement, so there could be no breach; however, even if there was an agreement, it would be unenforceable. ADDS was free to submit a lower bid than CDT as long as the bidding process remained open. In this case, however, Intel had already accepted CDT's bid *before* ADDS made a lower bid. ADDS was aware of this fact, so the submission of a lower bid constituted a wilful and knowing attempt to interfere with the economic relationship which came into existence when Intel accepted CDT's bid. If ADDS had made its second bid while the bidding was still open, rather than after the CDT bid was accepted, then CDT would have no cause of action against ADDS for wrongful interference. The facts of this case indicate that ADDS successfully undermined CDT by destroying the economic relationship with Intel. The conduct of Intel in this matter, though questionable, is not before this Court.

4. ADDS argues that it was caused irreparable injury because of the malfunctioning Regents and that its loss manifestly exceeded harm to the company's distributors. The Court finds that this argument has little weight in assessing damages against ADDS. Had ADDS taken the Regents off the market while attempting to

correct the problems, especially after in-field repair was not succeeding, it would not have caused the extensive damage to itself or its distributors. ADDS had a proven product line, which the Regents was to replace, which was very successful and considered the "workhorse" of the industry. Had ADDS pulled the Regents and replaced them with its proven product line, neither ADDS nor its distributors would have suffered to such an extent.

5. ADDS further argues that the punitive damage award is excessive. An oppressive verdict on the issue of punitive damages is a sound basis for granting a new trial. *Herman v. Hess Oil Virgin Islands Corp.*, 379 F.Supp. 1268 (D.V.I.) aff'd 524 F.2d 767 (3rd Cir. 1974); however, in order to warrant the granting of a new trial on such ground, the amount of the damages awarded must be such that it shocks the conscience of the Court. *Palmer v. Moren*, 44 F.Supp. 704 (M.D.Pa.1942). The Court finds no evidence that the damage award is excessive as a matter of law.

ADDS argues that the punitive damages amount to ⅓ of the entire net worth of the company. As evidence, defendant uses the net income figure for the first 9 months of 1980 in his calculations. Defendant, however, fails to mention that the retained earnings for the company for that period amounted to $23,364,000.00 and that the bank line of credit for the company at that time was $23,000,000.00. In addition, ADDS is now a wholly owned subsidiary of National Cash Register (NCR) which has a stable financial base. It is difficult for the Court to conclude that the original punitive damage award of $500,000.00 is excessive in light of the company's quarterly report to the Securities and Exchange Commission for the quarter ending August 31, 1980, which was dated October 15, 1980, and made a part of defendant's motion for a new trial and from which the above figures are taken.

6. The Court concludes that:

(a.) The antitrust defense of ADDS has no merit under the facts of this case and, accordingly, fails.

(b.) ADDS is liable for wrongful interference with an economic relationship based on the method used by ADDS in securing the Intel sale, i. e., submitting a lower bid to Intel *after* the CDT bid had been accepted.

(c.) ADDS is liable for punitive damages for its wrongful interference and for its fraudulent conduct with regard to the sale of the Regents.

(d.) The punitive damage award is not excessive.

(e.) The motion to amend or alter judgment has no merit and should be denied.

(f.) The motion for a new trial has no merit and should be denied.