UNITED STATES of America, Plaintiff,

Spokane Tribe of Indians,
Plaintiff-in-Intervention,

v.

Barbara J. ANDERSON, et
al., Defendants.

No. 3643.

United States District Court,
E.D. Washington.

Aug. 23, 1982.

John E. Lamp, U.S. Atty., E.D. Wash., Spokane, Wash., Michael R. Thorp, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for plaintiff, United States of America.

Robert D. Dellwo, Spokane, Wash., for plaintiff intervenor, Spokane Tribe.

John F. Campbell, Leo J. Driscoll, John McRae, Spokane, Wash., Theodore O. Torve, Asst. Atty. Gen., Dept. of Natural Resources, Charles B. Roe, Jr., Sr. Asst. Atty. Gen., Olympia, Wash., Lucinda S. Eymann, Spokane, Wash., for defendants.

QUACKENBUSH, District Judge.

## I. NATURE OF THE CASE

This action, filed by the United States in 1972, seeks an adjudication of water rights in the Chamokane Stream System which is located in the northeastern portion of the State of Washington. The government acted on its own behalf and as trustee for the Spokane Tribe of Indians. The court permitted the Tribe to intervene as plaintiff. Defendants include the State of Washington (Department of Ecology and Department of Natural Resources), Dawn Mining Co., Boise Cascade, and all other persons who claim an interest in the water of Chamokane Creek, its tributaries or its ground water basin.[1] Jurisdiction lies in this court under 28 U.S.C. § 1345.

The case was tried in two segments before the Hon. Marshall A. Neill in 1974 and 1978. On July 23, 1979, Judge Neill filed his Memorandum Opinion and Order (Ct. Rec. 189); judgment was entered September 12, 1979 (Ct.Rec. 196). Judge Neill died October 6, 1979.

Shortly thereafter, five of the parties filed motions to amend. There are two later motions to amend or supplement the judgment (Ct.Rec. 220, 227). Argument was heard before Magistrate Smithmoore P. Myers on February 29, 1980. All of the parties, pursuant to instructions of Magistrate Myers, submitted proposed changes in the Memorandum Opinion and Order and in the Judgment (Ct.Rec. 207, 209, 210, 211, 212 and 214) after which time oral argument was again heard. Magistrate Myers considered each of the proposals and submitted his Report and Recommendation on December 21, 1981 (Ct.Rec. 234, 235). Each party, except the United States has filed objections and moved to amend the Judgment (Ct.Rec. 237, 243, 244, 246, 248 and 249). The matter was then referred to this court for a final determination of the various motions. This court, by letter dated July 16, 1982, sought clarification from the parties as to their positions with regard to certain issues. The time for further response having passed, this court proceeds to address the issues before it.

## II. BACKGROUND

All parties to the litigation claim water in the Chamokane Creek area, either based upon Tribal reserved water rights or state appropriative rights, and the plaintiffs seek other relief in aid of their asserted water rights. The first section of this memorandum includes a description of the Chamokane Creek basin. Next, as in Judge Neill's memorandum, the parties' claims concerning water are discussed and determined in the following order: first, plaintiffs' claim to water, including the Indians' reserved water rights claims and the United States' water claim; second, defendants' claims to water pursuant to state law; and third, the plaintiffs' other requested relief, including request for permission to modify the judgment, and request to enjoin the state from exercising jurisdiction over water rights within the basin.

## III. DISCUSSION

### PRELIMINARY CONSIDERATIONS

All motions are under Rules 52 and 59, Fed.R.Civ.P. These rules are not

---

1. In this memorandum, the term "Chamokane Basin" is used to refer to the entire system, including the creek, its tributaries, and its ground water basin.

intended to provide a vehicle for reargument and rehearing. "A party who failed to prove his strongest case is not entitled to a second opportunity by moving to amend a finding of fact and a conclusion of law." 9 Wright & Miller, Federal Practice & Procedure, 722 (1971). Instead, they provide a means to amplify and expand the findings and judgment, and to correct manifest errors in fact or law. *Consolidated Data Terminals v. Applied Digital Data Systems*, 512 F.Supp. 581, 588 (N.D.Ca. 1981); *Davis v. Mathews*, 450 F.Supp. 308, 318 (E.D.Ca.1978). The burden of showing harmful error rests on the moving party, *Purer & Co. v. Aktiebolaget Addo*, 410 F.2d 871, 878 (9th Cir.1969), and a motion to amend invokes the sound discretion of the court. 11 Wright & Miller, *supra* at 32–33.

### THE CHAMOKANE CREEK BASIN

As stated in Judge Neill's findings, Chamokane Creek has a drainage area of 178 square miles. The headwaters of the creek lie in the Huckleberry Mountains north of the Spokane Indian Reservation. The creek flows eastward through the Camas Valley in what is known as the Upper Chamokane area, carrying runoff from the mountains and precipitation which finds its way into the surface flow. Near the town of Springdale, Washington, the creek turns southeastward. At the northern boundary of the Spokane Indian Reservation, the creek flows south and southwesterly through the Mid-Chamokane area (Walter's Prairie) to Chamokane Creek Falls. The creek flows continuously in the northernmost two-mile section of the Mid-Chamokane area, and then for the next five miles is intermittent and is dry during the summer. At the end of the five mile intermittent-flow area, just above Ford, Washington, and for the next three miles, massive springs with a regular flow throughout the year feed the creek which flows to the falls. The groundwater flow from the basin drainage system surfaces either at the springs or at the falls. The water then flows from the falls another 1.5 miles to the mouth of the creek, where it joins the Spokane River. The area between the falls and the mouth of the creek is known as the Lower Chamokane area.

Judge Neill also found the creek and the groundwater system to be interrelated. Water enters the Chamokane Creek basin in the form of precipitation. In the Upper Chamokane area, the precipitation absorbed into the ground area becomes part of an underground reservoir unconnected to the Chamokane drainage system. The surface flow of the creek from the Upper Chamokane area which reaches the Mid-Chamokane region does become part of the Chamokane system, either by entering the basin groundwater system as recharge or by remaining as surface flow and exiting over the falls, usually as spring floods. Precipitation falling on the Mid-Chamokane region which is not lost by evaporation or evapotranspiration also becomes part of the groundwater system or flows over the falls as spring surface runoff.

The recharge to the basin aquifer, which comes from precipitation, varies from year to year. Groundwater withdrawals in the Upper Chamokane region have no impact upon the creek flow below the falls because groundwater in this area is part of a separate aquifer. Groundwater withdrawals in the Mid-Chamokane area, however, eventually do reduce the lower creek flow. This flow reduction occurs less immediately when the water removal occurs a greater distance upstream from the falls. Although the effect of groundwater removal near the springs sometimes is immediate, the effect of groundwater removal near the northern boundary of the reservation can be delayed up to two years.

### THE PLAINTIFF TRIBES' CLAIMS TO WATER

A. *The Nature of the Indians' Reserve Water Rights:*

■ When the United States has set aside a reservation of land, it impliedly reserves water then unappropriated in sufficient quantity to accomplish the purposes of the federal reservation. *United States*

*v. New Mexico*, 438 U.S. 696, 698–700, 98 S.Ct. 3012, 3013–3014, 57 L.Ed.2d 1052 (1978); *Winters v. United States*, 207 U.S. 564, 577, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). "[T]he reservation is implied, rather than express ... because of the history of congressional intent in the field of federal-state jurisdiction with respect to water". *United States v. New Mexico*, 438 U.S. at 701–02, 98 S.Ct. at 3015. Indian tribes hold reserved water rights under the *Winters* doctrine. *Winters v. United States*, 207 U.S. at 564, 28 S.Ct. at 207.

■ The *Winter's* doctrine is antithetical to the prior appropriation systems utilized throughout the western states. Under state law, appropriative rights ripen through actual diversion of and continued beneficial use of waters from their natural channels. Since these rights are not appurtenant to the land they can be filed separately. They are, however, subject to loss through non-use. Priority relates back to the specific date and hour of appropriation. There is no proration. Therefore, in times of shortage, the prior appropriator's rights are filled before junior holders are permitted to take water. *See United States v. Big Bend Transit Co.*, 42 F.Supp. 459 (E.D.WA 1941).

■ In contrast to appropriative rights created under state law, Indian *Winters* rights implicitly reserve to the Tribe a paramount right to the use of as much water which comes in contact with their reservations as is needed to fulfill the *primary* purposes for which the land was reserved. *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir.1981) *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). This is so regardless of whether the water was actually used at the time of the creation of the Reservation, and priority of rights relates back to the date of formation. Accordingly, actual diversion and beneficial use does not create the Tribe's reserved right and disuse does not destroy it. In other words, *Winters* rights are subject only to private appropriative rights which have vested prior to the establishment of the reservation, and which have

not been subsequently lost through abandonment or non-use. *See Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *United States v. Ahtanum Irrigation District*, 236 F.2d 321 (9th Cir.1956), *cert. denied*, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957).

1. *Reserved Water Rights for the Fishery.*

■ The plaintiffs correctly claim that one of the purposes for creating the Spokane Indian Reservation was to insure the Spokane Indians access to fishing areas and to fish for food. *See*, Ct.Rec. 189, at 9. Therefore, under the *Winters* doctrine the Tribe has the reserved right to sufficient water to preserve fishing in the Chamokane Creek. *See, e.g., United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). The quantity of water needed to carry out the reserved fishing purposes is related to water temperature rather than to simply minimum flow. Ct. Rec. 189, at 10. The volume of water needed to preserve fishing in the creek below Chamokane Falls, was a furiously disputed issue at trial. Judge Neill held that the flow from the Falls into Lower Chamokane Creek must be sufficient to maintain the water temperature at 68°F or below, and in any event, at least 20 C.F.S. The Tribe has moved to amend this finding contending that current evidence shows the 20 C.F.S. flow is inadequate to maintain the required temperature, and that the minimum flow should be 30 C.F.S. Ct.Rec. 237 at 1–2. Magistrate Myers recommended that no changes be made regarding allocation of water to preserve the Chamokane Fisheries, and this court agrees with the recommendation. It is clear that a flow of 20 C.F.S. would not *always* maintain the water temperature at 68° or below. A flow of 30 C.F.S., on the other hand, will not *always* be required to keep the water temperature at that point. Thus, if the appointed Water Master finds, as a result of his experience, that a higher flow is necessary at any time to accomplish the purpose, he is empowered to make the adjustment. If,

however, over a period of time, flow and temperature records demonstrate that 20 C.F.S. flow is not realistically related to the maintenance of water temperature at 68° or below, the judgment is subject to modification. Therefore, Judge Neill's factual determination and allocation of water for the Chamokane Fisheries should not be disturbed.

2. *Recharge Storage Capacity of the Aquifer.*

 The Tribe has moved the court to amend Judge Neill's findings regarding the Chamokane drainage system. *See* Ct.Rec. 193. The Tribe agrees with the finding that the average output of the Chamokane drainage system is 35,000 acre-feet per year. The Tribe requests that the finding additionally reflect that the average of 16,000 acre-feet are lost in the annual runoff, and that the recharge storage capacity of the aquifer is approximately 19,000 acre-feet, with an annual flow out of the springs of about 21,000 acre-feet. Magistrate Myers concluded that adding these additional findings to the amended memorandum and judgment is appropriate. This court agrees since the addition merely supplements and does not contradict the original finding. Accordingly, the Tribe's motion is GRANTED.

3. *Fish Hatchery.*

The Tribe further moves that Judge Neill's Opinion at p. 11 be amended to show that the hatchery which is awarded 10 C.F.S. for non-consumptive use is *on* the Reservation rather than *off* of it. Ct.Rec. 198, at 2–3. This is factually accurate according to the record, and there has been no opposition to the proposed correction, as demonstrated by the responses to this court's letter to counsel. Magistrate Myers recommended that the Memorandum Opinion be corrected to show that the hatchery is on the Reservation. This court agrees the use of the term "off" was apparently inadvertent, and therefore, the Tribe's motion for correction is GRANTED.

4. *Clarifying Clause.*

Lines 2, 3 and 4 on p. 12 of the original Opinion reads, "plaintiffs do not challenge the state's jurisdiction to issue water permits for uses outside the Reservation". The Tribe has moved the court to amend this sentence by adding the following clause: "except to the extent that such pertain to waters which are part of the Chamokane Creek basin". Ct.Rec. 198, at 3. This court rejects the Tribe's latter request as unnecessary. As stated earlier, motions to amend are not permitted for the purposes of refashioning argument after disclosure of the court's reasoning, and the movant has not pointed to any portion of the record to justify the addition of this somewhat ambiguous and possibly far-reaching addendum. Consequently, the motion is DENIED.

B. *The United States' Water Claim:*

 The United States, through its Bureau of Reclamation, Department of Interior, claims a right to the non-consumptive use of 10 C.F.S. of the flow of Spring Creek, a tributary of Chamokane Creek for fish propagation. This water use was authorized by the State of Washington through Surface Water Certificate No. 2831. The authorization is for the use of water outside exterior boundaries of the Indian Reservation, and none of the parties have challenged the validity of the state's certificate. Judge Neill held the United States has a valid right to water as authorized in this certificate.

Motions filed by the United States, then, essentially support and approve those filed by the Tribe. Ct.Rec. 201 and 209. The motions of the United States and the Tribe will therefore be considered together, although it is noted that the United States did not object to the Magistrate's Report and Recommendation. Ct.Rec. 249.

C. *Claims Asserted by the State of Washington:*

1. *State Water Code.*

The State of Washington Department of Ecology has filed a motion to reconsider and modify Judge Neill's Opinion based

upon two general criticisms of the judge's interpretation of the state's water code. Ct.Rec. 202. First, the Department asserts that claims prior the State's 1970 Water Code have been omitted from the decision. *Id.* at 2. *See also*, Ct.Rec. 248. Judge Neill's findings concerning the defendants' recognized water rights are listed in a chart in the decision. See Ct.Rec. 189 at 13–14. The judge emphasized in his decision that the rejected claims were omitted from the listing. Clearly, this was an intentional act on the judge's part based upon his analysis of all of the evidence and his review of the law. Therefore, the defendant's contention is a reargument of its trial position in an area where there are no manifest errors of fact or of law. Hence, this court agrees with Magistrate Myers' recommendation that no change be made in this area, and defendant's motion is DENIED. The Department of Ecology further argues the trial court opinion erroneously confirmed some form of inchoate water rights to individual claimants based only upon applications for state permits. Ct.Rec. 202 at 2–3; Ct.Rec. 249; Ct.Rec. 189 at 14. Magistrate Myers concluded that the defendants' position is essentially a reargument of its contentions at trial. This court agrees, and may therefore not disturb the findings in the trial judge's opinion. The defendant's Motion is DENIED.

## 2. *Water Master.*

█ The Department of Ecology further moves the court to modify Judge Neill's Judgment, sections 12 through 14, to provide that the state make the selection of the Water Master. Ct.Rec. 202 at 3. The Department contends the McCarran Amendment, 43 U.S.C. § 666 (1976), contemplates that only state water code administrators may administer federal reserved rights. *Id.* This court disagrees with the movant's interpretation of the McCarran Amendment. The motion is DENIED.

As directed in Judge Neill's Memorandum and Order, the parties conferred in an effort to agree upon the individual to be appointed Water Master. They were unable to agree and have made nominations. The Magistrate, in a separate Report & Recommendation, recommended the appointment of Ira D. Woodward as Water Master. The recommendation of the Magistrate is accepted and Ira D. Woodward is hereby appointed Water Master of Chamokane Basin, to serve at the pleasure of the court, and under the terms of Judge Neill's Order of July 23, 1979, as herein amended.

## 3. *Change in Use.*

█ Judge Neill determined that the Tribe holds reserved water rights under the *Winters* doctrine for irrigation of crops. These waters were impliedly reserved at the creation of the Spokane Reservation. Ct.Rec. 189 at 5 and 9. The Tribe now desires to transfer water used for irrigation to the preservation of the fishery in the lower Chamokane area. The State Department of Ecology has objected to the Tribes' claim to water for a fishery. Ct.Rec. 202 at 5. *See also*, Ct.Rec. 248. The Department argues that a reserved water right is limited to only the primary purposes for which a Reservation is created. Although this contention is correct, there is no reason to disturb Judge Neill's appropriate conclusion that maintenance of the creek for fishing was a purpose for creating the Reservation. Ct.Rec. 189 at 9. Thus, the Tribe has the right to sufficient water to maintain the fishery. It is settled law that when a Tribe has a vested property right in reserved water, it may use it in any lawful manner. *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). Therefore, it is permissible for the Tribe to transfer its use of water for irrigation (a primary use) to the Tribe's fishery (also a primary use) if the Tribe wants to enhance its allotment of water to the fishery. Magistrate Myers concluded that the Department of Ecology's position should be rejected, Ct.Rec. 235, at 8, and for the reasons stated, this court agrees. (The State of Washington

Department of Natural Resources also contends that the right to change use is contrary to law and evidence. Ct.Rec. 200 at 2). *See also* Ct.Rec. 246. The Department of Ecology's Motion is DENIED.

### 4. *Replacement Fishing Grounds.*

▮ The State Department of Ecology (Ct.Rec. 202, at 5–6; Ct.Rec. 248) and the State Department of Natural Resources (Ct.Rec. 200, at 2; Ct.Rec. 190, at 2) argue that since the Tribe's historic fishing grounds were destroyed by the construction of dams on the Columbia River, their right to water flows for fisheries no longer exist. The Ninth Circuit in *Walton, supra* emphasized that changed circumstances do not abrogate the Tribe's right to reserved water for fishing. (That court found an implied reserved water right for replacement fishing grounds). It therefore follows, that the implied reservation applies as well to the situation here (maintenance of trout in the lower Chamokane) as to that in *Walton*. Magistrate Myers concluded that no change should be made in Judge Neill's Opinion in this respect. Ct.Rec. 235 at 8. This court agrees; the defendants' Motion to Modify the Opinion and Judgment is DENIED.

### 5. *Miscellaneous Modifications.*

The Department of Ecology has moved to modify under what it entitles a miscellaneous category. Ct.Rec. 202 at 10–13. The Department objects to the inclusion in Section 10 of the Judgment (Ct.Rec. 198 at 6) claiming that the provision for modification of the Judgment "upon a showing of substantial change in circumstances" results in a greater need for water by the Tribe. It further wants plaintiffs specifically included in Section 22 (*Id.* at 10) which enjoins defendants from asserting rights beyond those in the judgment, or from taking Chamokane Creek waters so as to interfere with the prior rights of others. (Ct.Rec. 202 at 12). Magistrate Myers concluded that since the Tribe has a prior reserved right to all or practically all of the waters of Chamokane Creek, and that any

use of the waters by defendant is in strict subordination to those prior rights, there seems to be no reason or necessity for the modification sought by the Department of Ecology. This court agrees that there is no need to modify Section 22 of Judge Neill's Judgment. Regarding the Department's objection to the Tribe's right to modify the judgment, Section 10, the law is clear the Tribe has a right to reserved water for present as well as future needs. *Arizona v. California,* 373 U.S. 546, 600, 83 S.Ct. 1468, 1497 (1963). This court is also aware that open-ended water rights create uncertainty and conflict in western water law, *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 48 (9th Cir.1981), 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981) and general adjudications are designed to close the openendedness of all varieties of federal and state claims. While the Department argues that Section 10 as written appears to allow the Tribe to reopen the case for the purpose of allowing them to apply for a future non-reserved purpose, the Department's argument is misplaced. As discussed earlier, tribes only have reserved waters based upon the primary purposes for creating the reservation, and these quantified reserved rights may be used in any lawful manner. Therefore, retention of jurisdiction for future modification is appropriate for reserved rights based on primary purposes, and it would be inappropriate to alter the judgment. The Department's Motion is DENIED.

### 6. *Irrigable Acreage.*

The state asserted at trial that the Tribe could not claim reserved water for acreage which was classified as timber or grazing land under the Act of May 29, 1908, Ch. 217, 35 Stat. 458. *See* Ct.Rec. 189, at 6–8. Judge Neill rejected this argument, finding that Indians should be allowed to benefit from modern technology which permits irrigation of land formerly not practicably irrigable. *Id.* at 6, *citing United States v. Winters, supra,* and *Arizona v. California, supra.* The Department of Ecology (Ct.Rec. 202, at 6–7 and Ct.Rec. 248) and

the Department of Natural Resources (Ct. Rec. 200, at 2. *See also* Ct.Rec. 246 at 5) have filed motions to reconsider the issue. Magistrate Myers reasons that both defendants are basically trying to reassert and reargue their positions advanced during trial and concludes there were no omissions and no manifest errors in law or in fact. Ct.Rec. 235 at 6. This court agrees. The record reflects careful consideration of the issues. Since there are no manifest errors in law or in fact, reopening consideration of this issue runs counter to the purposes of Rule 52 and Rule 59 motions. Therefore, the Motions of the Washington State Department of Ecology and the Washington State Department of Natural Resources for reconsiderations are DENIED.

### 7. *Department of Natural Resources Water Claims*

 The Department of Natural Resources has moved the court to "reconsider" and "modify" the Memorandum Opinion claiming the court failed to recognize its rights to water within the Chamokane Basin. Ct.Rec. 190 and Ct.Rec. 200. In the Memorandum Opinion, the claims of the Department of Natural Resources were not found to be "perfected" under state law. Ct.Rec. 189 at 12. Therefore, the Department's water claims were omitted from the chart listing recognized water rights in Chamokane Creek. See Ct.Rec. 189 at 13 and 14. Judge Neill generally held, however, that "[w]ater for domestic use is not included within the judgment, as it is *de minimus* and should always be available." Ct.Rec. 189 at 16.

Since issuance of the Magistrate's Report and Recommendation, the state has attempted to clarify its somewhat unclear position with respect to its asserted *de minimus* riparian right to water for domestic *and stock* purposes. Ct.Rec. 246 at 1–5. Specifically, the state reasons that perfection of a valid riparian right to water for domestic and stock purposes does not require obtaining a state permit. It is further argued the undisputed evidence shows that domestic and stock water uses began in the early 1900's and have continued since that time. *Id.* at 3. Moreover, the state maintains the trial court's *de minimus* ruling, quoted above, "was a result of an analysis of the evidence wherein the *plaintiff's* testimony was that *stock water and domestic* uses were *de minimus* uses and *did not affect* the flow of Chamokane Creek." Emphasis added. Consequently, it is argued the part of the Opinion finding no perfection and the part ruling upon *de minimus* use are inconsistent. Since no opposition has been voiced, the state would have this court either perfect the state's water rights or issue an alternative ruling that stock water and domestic uses are not being adjudicated and delete the reference to failure to perfect. Ct.Rec. 246 at 3 and 4. The state resists any additional, explanatory language to the effect that there should be no substantial increase in stock numbers. Such qualifier should not be included, it is argued, because (Judge Neill did not qualify his *de minimus* ruling and) such language would be "misleading" and "ambiguous". *Id.* at 4. The further contention is that the evidence in this action was that normal stock water grazing related to the carrying capacity of the land is *de minimus*.

On July 16, 1982, this court wrote to all counsel asking whether any parties other than the state (or Boise Cascade, *infra*) had taken a contrary or other position with respect to this riparian right issue. No party has indicated a contrary position. Hence, this court is left with the following proposition: The undisputed evidence is that normal stock water use (grazing related to the carrying capacity of the land) and domestic water use is *de minimus* and does not include impoundments. The Memorandum Opinion is therefore adjusted to reflect that these uses *are not included* in the judgment and should always be available. The reference to the failure of the state to perfect, insofar as such reference pertains to these *de minimus* uses, then, is deleted. These changes are meant to merely amplify the findings so as to avoid possible differing interpretations from arguably

inconsistent opinion language. To this extent only, the Motion is GRANTED.

■ Finally, the Department of Natural Resources argues that since their water usage is *de minimus* and does not affect the flow of Chamokane Creek, it should not have to pay for the Water Master. Ct.Rec. 246 at 5 and 6. Again, no objections to this seemingly appropriate arrangement have been raised. Since usage is *de minimus* (and so long as it remains so), the Department's Motion is GRANTED.

### D. *Claims Asserted by Dawn Mining Company*

Dawn Mining Company owns three (3) parcels of land, one on the Reservation and two adjacent. It operates a plant for processing uranium ore from the Reservation. Judge Neill's Judgment recognized a water right in Dawn for 1 C.F.S. with a priority date of August 1, 1956. Ct.Rec. 189, at 13.

On March 13, 1974, a stipulation was filed in this case between the Tribe and Dawn. Ct.Rec. 114. The Tribe agreed that regardless of the outcome of the litigation, it would permit Dawn to divert 1 C.F.S. from the water decree belonging to the Tribe so long as Dawn operated the mill and used the water in that operation. This stipulation essentially confirmed the state-awarded 1 C.F.S. right referred to above. Since the water would come from the Indians' share, there would in effect be a higher priority and Dawn would have greater assurance of receiving the water at all times.

In addition, the agreement provided that Dawn would be entitled to 1 C.F.S. from the Tribe's share for domestic consumption, including stock water and irrigation. This part of the agreement was to be effective without reference to the operation of the mill. There was no mention of this stipulation in the court's Opinion or in the Judgment filed September 12, 1979. On June 23, 1980, Dawn filed its proposed changes in the Opinion and the Judgment. Ct.Rec. 211. On November 25, 1980, Dawn filed its formal Motion to Correct the Judgment and Findings. It relied on Fed.R. Civ.P. 60 permitting the court, on its own initiative or the motion of a party, to correct errors arising from oversight or omission.

On January 9, 1981, Dawn filed an Alternative Motion for Supplemental Judgment Approving the Stipulation. Ct.Rec. 227. In this motion, Dawn sought an Order and Decree that the stipulation is binding upon the signers. The motions were argued on January 26, 1981 before Magistrate Myers. The three signatories to the 1974 stipulation agreed to the entry of a Supplemental Judgment, the effect of which would be restricted to them. The Department of Ecology objected on the merits to "off Reservation, non-Indian" use of reserved Indian waters.

Magistrate Myers concluded that it was by an inadvertent oversight that Judge Neill did not address this issue in his Opinion and in the Judgment. Therefore, it was proper under Rule 60 for the court to consider the issue. Ct.Rec. 235, at 11. This court agrees.

■ Based upon this premise Magistrate Myers considered the legal effect of the stipulation and its grant of water to Dawn for the ore plant and for irrigation and stock water purposes. It was decided that water was necessary for the operation of the Dawn ore plant which processed ores from the Indian Reservation and that the activities of Dawn were of real benefit to the Tribe. Thus, even though such a use would not have been contemplated when the Reservation was established, the use of Tribal reserved water in this manner, is not and should not be so limited. Ct.Rec. 235, at 12. Magistrate Myers recommended that the court enter a Supplemental Judgment as agreed by the signers in the 1974 Stipulation affirming the transfer of 1 C.F.S. of water from the Tribe to Dawn, as a proper use of the water and providing that the terms of the Stipulation in this respect are binding among the three signatories. *Id.* This court agrees. A supplemental judgment shall include 1 C.F.S. of water for the operation of the ore plant.

As to that part of the Stipulation which grants to Dawn 1 C.F.S. of water for irrigation and stock water purposes, the conclusion in the Report & Recommendation is the attempted transfer is unlawful, Ct.Rec. 235 at 12, based upon the following observations: (1) that the transfer of water to Dawn was of no direct benefit to the Tribe; (2) that, via the Stipulation, a non-Indian off-reservation user, who had not qualified under state law for the diversion, was moved up to a position of priority equal to that of the Tribe; (3) and that under this theory, the Tribe could give or sell all its reserved water to any off-Reservation commercial user. *Id.*

Since the filing of the Report & Recommendation, Dawn Mining has further argued in support of this second part of the stipulation that the parties should be permitted to stipulate rather than litigate. Dawn further challenges the Department of Ecology's standing to object to the stipulation. The Department has not asked to respond to these latter contentions, nor did it address this issue in its letter of response to the court's July 16, 1982, letter of inquiry. Consequently, its objection to the stipulation is now deemed abandoned. Also, no other party opposes the stipulation.

This court agrees that taking this second part of the stipulation to a possible logical extension would conceivably permit a Tribe to sell all of its reserved water to any off-Reservation commercial user. However, such is not the argument which is presently before the court. In addition, there is the added safeguard of involvement by the United States which has approved the present sale of *de minimus* amounts of water. No one raises a question of whether appropriate government consent procedures, if necessary, have not been followed. See Cohen, Handbook of Federal Indian Law, 1982 Ed. at 593.

As discussed earlier, Professor Cohen has reasoned that "[s]o long as other water users are no worse off than they would have been if the rights had been exercised for their original use at the original place, Indians and Indian Tribes presumably [should] be allowed to change the nature and place of use of their reserved rights in order to further the purposes of their reservations and to advance their economic self-sufficiency." *Id.* at 592. The Dawn stipulation does not present the "logical extension" scenario of a potential investor with plans to use large amounts of "conveyed" reserved water. See Cohen, *supra.* The consent of the United States adds additional protections. Accordingly, this court finds part two of the stipulation to be lawful.

### E. *Claims of Boise Cascade*

#### 1. *Water for Stock, Timber, Road Maintenance and Fire Protection*

█ Boise Cascade filed a Proposed Revision of the Court's Memorandum and Judgment. Ct.Rec. 212. *See,* Ct.Rec. 199. Boise Cascade argues that their right to water for stock, timber, road maintenance, dust control, and fire protection was erroneously omitted from the original Memorandum Opinion. *Id.,* at 4–5. At the February 29, 1980 hearing before Magistrate Myers, the Tribe agreed that they have no objection to use of Chamokane water for these purposes as long as it is not quantified or impounded and as long as the stock is not substantially increased in numbers. In his Report & Recommendation, Magistrate Myers ruled that the use of water by Boise Cascade is *de minimus,* and without affect on the flow in the Lower Chamokane. The Magistrate concluded that the Opinion and Judgment be amended to show:

(a) That water for domestic use and for stock is *de minimus* and not included within the Judgment, and that so long as the water is not impounded and so long as there is no substantial increase in stock numbers Boise Cascade has a right to water for these purposes.

(b) That Boise Cascade may use water for dust control, road maintenance and fire protection, as long as it remains *de minimus* or is with the consent of the Tribe.

(c) The Tribe may apply to the court for protection at any time if use of Chamokane water for the purposes set forth in the two preceeding sections appears not to be *de minimus*, or in any other way violates the Opinion and Judgment.

(d) Boise Cascade's Alternative Motion for a New Trial should be denied as the grounds alleged do not justify a new trial.

This court agrees and the Opinion and Judgment shall be so amended. If increases in "numbers" of stock result in a use which is more than *de minimus*, the Tribe may apply to the court for protection.

### 2. *Payment of the Water Master*

The Tribe and Boise Cascade agree that it is impossible to adequately measure the *de minimus* use of Chamokane water by Boise Cascade. Ct.Rec. 243 at 1–2. The court agrees. Accordingly, Boise Cascade, is excluded from participation in the payment and continuing supervision of a Water Master so long as its use remains *de minimus*.

### F. *Plaintiff-Tribes' Other Requested Relief*

### 1. *State Jurisdiction Over Non-Indian Water Rights*

Judge Neill held in his Opinion that the State of Washington has jurisdiction over non-Indian water rights in the Chamokane Basin, and within the Reservation, so long as it is not pre-empted by federal law and does not infringe upon Tribal rights to self-government. Ct.Rec. 189, at 15–16. The Opinion referred, in this connection, to Judge Neill's earlier decision in *Colville Confederated Tribes v. Walton*, 460 F.Supp. 1320 (1978). In the *Walton* decision, Judge Neill held that federal jurisdiction over water was restricted to regulation of reserved water. Thus, held Judge Neill, state jurisdiction over surplus waters was not pre-empted by federal law and did not infringe on the Indians' right to self-government. *Id.* at 1333. On appeal, the

Ninth Circuit held that under the *Walton* facts state regulation of water was pre-empted by the creation of the Colville Reservation.[2] The circuit court, however, emphasized that its decision was made easier by the fact that the entire water system (No Name System) was within the Reservation. Thus, under those circumstances, held the circuit, state regulation of a portion of the water would create jurisdictional confusion. *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 53 (9th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

In his Report & Recommendation, Magistrate Myers stated that the *Walton* Ninth Circuit decision raised a question as to whether state regulation of surplus water in the Chamokane Creek Basin is similarly pre-empted by federal law. Ct.Rec. 235 at 15. The Magistrate concluded that the force of the *Walton* Ninth Circuit decision does not preclude state jurisdiction under the facts presented in this case. This court agrees based on the following rationale:

The narrow issue in this case is whether the state may regulate excess waters on land owned by non-Indians inside the Reservation where the water system arises and partly flows outside the reservation and where the amount of excess water is small relative to the amount of reserved water.

At the outset it should be noted, that although the twin barriers, pre-emption and infringement on Tribal self-government, are independent, they are nevertheless related by the concept of Tribal sovereignty. *Colville Confederated Tribes v. Walton*, 647 F.2d at 56. The doctrine of federal pre-emption evolved from an 1832 Supreme Court decision, *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). *See also, Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1931); *Johnson v. McIntosh*, 21 U.S. (8 Wheat) 543, 5 L.Ed. 681 (1823). In 1980, the Supreme Court in *White Moun-*

---

**2.** This was the holding on rehearing. In its original opinion, filed August 20, 1980, the reviewing court held that the state may regulate water not reserved for the Indians. This opinion was withdrawn and replaced by the opinion upon rehearing.

*tain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), laid down a specific rule for analyzing pre-emption claims in Indian cases generally and in cases involving non-Indians on Reservations particularly. *See also, White Mountain Apache Tribe v. Arizona,* 649 F.2d 1274 (9th Cir.1981). The Court stated where "a State asserts authority over the conduct of non-Indians engaging in activities on the Reservation," the Court must make "a particularized inquiry into the nature of the state, federal and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.,* 488 U.S., at 145, 100 S.Ct. at 2584. This rule, rather than normal rules of federal-state pre-emption must be applied in Indian cases. *See Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583. From this Supreme Court decision it is clear that equal weight is given to the competing interests of the state in regulating the affairs of non-Indians, the firm federal policy of promoting Tribal self-sufficiency and economic development, and the tradition of Indian sovereignty over the Reservation and Tribal members. No Congressional statute specifically pre-empts state regulation of surplus non-reserved water located within the exterior boundaries of an Indian Reservation. *But see,* Public Law 280, 28 U.S.C. § 1360 (1976), 25 U.S.C. §§ 1322 through 1326 (1976) (states may not exercise jurisdiction over Tribal reserved waters). Nor is there a pervasive federal regulatory scheme that works to pre-empt state regulation of non-Indian users on the Reservation.

The fact that water per se lies within the exterior boundaries of an Indian Reservation does not necessarily negate a state's interest in overseeing its useage along with the other-in-state water systems. Washington is obligated to regulate and conserve water consumption for the benefit of all its citizens. Therefore, the state's special concern is shared with, not displaced by, similar Tribal and federal interests when water is located within the boundaries of both the state and the Reservation.

The weight of the state's interest depends, in large part, however, on the extent to which waterways or aquifers transcend the exterior boundaries of Indian country. In the *Walton* decision, the stream in question was small, non-navigable, and located entirely within the Reservation. The circuit court determined that water use by non-Indians would have a direct and immediate negative impact on Tribal agriculture and fishery projects. Thus, the circuit court held that even though some portion of the Creek was found to be surplus to the Tribe's need, state regulation of the remaining supply would create jurisdictional confusion and violate Tribal sovereignty. The court thereupon found federal pre-emption of any state jurisdiction. In contrast, the Chamokane Creek arises outside the Reservation, and its course, for a good share of its length, continues to be outside. When it comes to the Reservation, it forms the eastern boundary, and much of the land with state water rights is immediately adjacent to the Creek. See Report & Recommendation analysis, Ct.Rec. 235 at 15. The facts in this case are readily distinguishable from the facts in the *Walton* case. By weighing the competing federal, Tribal and state interests at hand, it is clear under the balancing test mandated by the Supreme Court in *Bracker,* that the mere creation of the Spokane Indian Reservation does not pre-empt state regulatory jurisdiction over surplus non-reserved waters on the Reservation. This determination is to be distinguished from the state *court* subject matter and personal jurisdiction determinations recently announced by the Ninth Circuit. See *Northern Cheyenne Tribe, et al. v. Adsit, et al.,* 668 F.2d 1080, 1087 (9th Cir. 1982); *San Carlos Apache Tribe v. Arizona,* 668 F.2d 1093 (9th Cir.1982).

This *Bracker* pre-emption analysis, by balancing interests, focuses on the extent to which federal law has removed the states' power, which would otherwise have been possessed, over non-Indians on a Reservation. Analysis of the right of self-government, on the other hand, focuses on whether state action impairs the ability of a

**14**

Tribe to exercise traditional governmental functions. See *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). Thus, while self-government is related to federal pre-emption in the sense that both depend on Congressional action and in the sense that pre-emption is considered in the context of deeply ingrained traditional notions of tribal sovereignty, the self-government doctrine may be an independent barrier to state regulation. *Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1110 (9th Cir. 1981) *citing White Mountain Apache Tribe v. Bracker*, 448 U.S. at 140, 100 S.Ct. at 2581.

▮▮▮ Tribal self-government extends only to intra-tribal relations and to concurrent civil authority for visitors to Reservations. *Montana v. United States*, 450 U.S. 544, 564–65, 101 S.Ct. 1245, 1257–58, 67 L.Ed.2d 493 (1981). Infringement then, must come from state action which interferes with Indian control over Indian internal affairs. This court does not conclude that the creation by state law of property interests in surplus waters for non-Indian landowners presumptively has this effect. A recent Supreme Court decision supports this contention. In *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Court held that in the absence of Congressional delegation, a Tribe's inherent power to regulate the conduct of non-Indians in Indian country was impliedly withdrawn as a necessary result of the Tribe's dependent status. Exceptions to this implied withdrawal exist. Where the conduct of non-Indians so threatens or has such a "direct effect on the political integrity, the economic security, or the health or welfare of the Tribe", inherent tribal regulatory powers are preserved. *Montana v. United States*, 450 U.S. at 566, 101 S.Ct. at 1258. The Ninth Circuit in *Walton* held that state regulation of the water system in that case infringed on the Colville Tribe's right to self-government. 647 F.2d 42 at 43. Therefore, the court concluded state regulation over non-Indian water rights on the Reservation was unlawful. In this case it is clear that Indian rights are recognized as superior to any of the non-Indian water rights and if the Indians choose to irrigate all the irrigable land, they would consume all or substantially all of the water in the Creek. Further, the Indian water right for preservation of the lower Chamokane fisheries requires that state recognized diversions be reduced when necessary to keep the flow up and the temperature down, in the Creek below Chamokane Falls. Therefore, as stated by the Magistrate, "no jurisdictional confusion is to be anticipated from the state allocation of surplus water, in a system of what is recognized to be subordinate rights". Ct.Rec. 235 at 16. This court does not believe that this state regulation of some portion of these excess waters would unlawfully infringe on the Tribe's water rights.

In his Report & Recommendation, Magistrate Myers recommended that no change be made in Judge Neill's ruling as to state water rights and state regulatory jurisdiction as to non-reserved waters on the Spokane Indian Reservation. Ct.Rec. 235 at 16. For the reasons stated, this court agrees. The Tribe's objections to Magistrate Myers' Report & Recommendation regarding recognition of state regulatory jurisdiction on the Reservation are accordingly DENIED. *See* Ct.Rec. 237 at 2–5.

### 2. *Alternative Source of Water.*

In his Report & Recommendation, Magistrate Myers noted the state's contention that since the Spokane River provides an alternative source of water to irrigate the agricultural lands on the Reservation, the Tribe should not be considered to have reserved rights to water from the Chamokane Creek. See Ct.Rec. 235 at 16. Upon independent consideration, this court agrees with the Magistrate's conclusion that the state's argument cannot be reconsidered under Rules 52 and 59. *Id.*

Hence, no change may be made in Judge Neill's Opinion or Judgment based upon the possible alternative source of water argument.