**CONSOLIDATED DATA TERMINALS, a California corporation, Plaintiff, Appellee and Cross-Appellant,**

**v.**

**APPLIED DIGITAL DATA SYSTEMS, INC., a corporation, Defendant, Appellant and Cross-Appellee.**

**Nos. 81–4152, 81–4176.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 1982.

Decided May 10, 1983.

---

386

Perez & McNabb Law Offices, Richard L. Perez, Orinda, Cal., for plaintiff, appellee and cross-appellant.

Alan R. Wentzel, New York City, Craig H. Casebeer, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for defendant, appellant and cross-appellee.

Before FLETCHER and BOOCHEVER, Circuit Judges, and EAST,** Senior District Judge.

FLETCHER, Circuit Judge:

Applied Digital Data Systems, Inc. (ADDS), a manufacturer, appeals from a district court judgment for $585,489.61 entered against it and in favor of Consolidated Data Terminals (CDT), a distributor, for damages arising from transactions involving computer terminals. The district court awarded these compensatory and punitive damages based on ADDS's negligent manufacture and sale of defective terminals to CDT, its fraudulent misrepresentations concerning the terminals, and also based on its tortious interference with a contract between CDT and Intel, a purchaser of computer terminals. We affirm the district court's conclusion that ADDS was liable to CDT for compensatory damages based on breach of contractual warranty; however, we find that these damages were calculated and awarded in part upon an erroneous theory, and reduce the amount of the award. Further, we conclude that ADDS was denied a fair trial on the tort issues of fraud and interference with contract, and remand the case for a new trial limited to these issues. We likewise vacate and remand the district court's award of punitive damages since they are dependent upon the outcome of the retrial on the tort issues.

## BACKGROUND

ADDS is a manufacturer of computer equipment, including cathode-ray computer terminals (CRT's). CDT distributes such terminals in California. In December, 1976, ADDS and CDT entered into a written distributorship agreement that made CDT a non-exclusive sales outlet for ADDS terminals. Under the agreement, ADDS promised to accept CDT purchase orders according to a fixed schedule of prices, while CDT promised to use "best efforts" to promote the lease and sale of ADDS products. CDT further promised to refrain from selling any other terminals deemed "competitive" by ADDS. Paragraph 2 of the contract provided that it was subject to cancellation by either party at any time upon 90-day notice. Paragraph 22 contained a merger clause stating in effect that no agreements between the parties existed outside of the written agreement, and specified that New York law would govern the agreement. The terms of this distributorship agreement were incorporated by reference into the sales contracts covering every item of equipment sold by ADDS to CDT.

For a time, relations between ADDS and CDT were satisfactory. But in late 1977, CDT ordered for the first time some of ADDS's newest and supposedly most advanced terminals, the Regent 100's. In written specifications, ADDS stated that these rather inexpensive CRT's would operate at the relatively high speed of 19,200 baud (1920 characters per second). In promotional literature, ADDS also claimed that the Regents would be "inherently reliable." In fact, as it turned out, none of the Regent 100 terminals was capable of attaining the 19,200 baud performance rate. Also, the Regent 100's were plagued by design errors and production problems that caused many of them to malfunction seriously. The district court found that "as many as 25%" were totally inoperative upon delivery. "When introduced, the terminals did not operate properly at any level above 4,800 baud and occasionally did not operate properly at 1,200 baud." CDT received a steady stream of complaints and returns from the customers to whom it distributed Regent 100's.

** The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

When informed of the problems with the Regent 100 terminals, ADDS attempted to perform its warranty obligations. ADDS distributed "releases" with proposed solutions for specific problems encountered with the terminals, established a repair depot where CDT customers could ship the defective equipment for service, and on one occasion, sent a special team of engineers to customer sites to work on the malfunctioning terminals. As a result of these efforts, all or most of the Regent 100's became functional within a year after the first terminal deliveries, but these terminals never operated at rates approaching 19,200 baud. According to testimony by a former ADDS salesman, the specifications on the Regent 100 model were eventually lowered to 1,900 baud.

Due in part to the continuing problems with Regent terminals, CDT discontinued efforts to sell Regent 100 terminals to its customers. For several months, CDT placed no additional orders for Regents. But in June, 1978, Intel Co., a large user of computer terminals, asked for bids to supply 127 Regent terminals and other computer equipment. ADDS, which had previously sold Regents directly to Intel, submitted a bid to supply terminals for the order. CDT submitted a bid to fill the entire order, including other equipment in addition to the Regent terminals. Upon receiving the initial bids, Intel informed CDT that its bid was successful because it was lowest, and notified ADDS that its bid was too high. Afterwards, ADDS learned the amount of CDT's bid on the terminals, lowered its asking price, and was awarded the final contract to supply the terminals. CDT was awarded the contract to supply the remainder of the equipment specified in the bid. When it learned of the ADDS-Intel terminal contract, CDT ceased dealing with ADDS. It entered into a new agreement to distribute terminals made by Hazeltine, another manufacturer whose products CDT could not previously sell under the ADDS distributorship agreement, since ADDS deemed Hazeltine terminals to be "competitive" with its models. Later, in 1979, CDT entered into another such agreement with Televideo, another "competitive" concern. CDT enjoyed considerable success selling these terminals, and also increased its sales of Lear-Siegler CRT products, which it had been permitted to sell under the ADDS distributorship agreement.[1]

In December, 1978, CDT filed this diversity action against ADDS, alleging several breaches of contract, breach of an implied covenant of good faith and fair dealing, unlawful interference with prospective business advantage, and fraud in the inducement to enter the distributorship agreement. ADDS answered and counterclaimed against CDT for $68,117.17, the unpaid balance owed by CDT to ADDS upon terminals delivered to CDT. Upon ADDS's motion before trial, District Judge Spencer Williams dismissed the breach of covenant of good faith and fair dealing cause of action. CDT's other claims were tried before District Judge Daniel H. Thomas. On the third day of the four-day bench trial, CDT was permitted to amend its complaint to add new claims for fraud and negligence by ADDS in its design, manufacture, and sale of Regent 100 terminals.[2]

---

1. According to findings 35–37 made by the district court, CDT's actual and estimated sales of these products during the years 1978–81 were as follows:

| | Hazeltine | Televideo | Lear-Siegler |
|---|---|---|---|
| 1978 | $ 37,500 | $ – | $ 574,000 |
| 1979 | 136,250 | 136,250 | 1,121,250 |
| 1980 | 187,500* | 735,000* | 1,650,000** |
| 1981 | 237,500* | 882,000* | 1,925,000* |

(*) Projected by the court based on estimates supplied by CDT.

(**) The court's projection, changed to correct an apparent arithmetic error.

512 F.Supp. at 586.

2. CDT's original complaint alleged that ADDS had fraudulently induced CDT to enter the distributorship agreement by promising to provide CDT with sales leads, a promise that it never intended to perform and did not perform. Although considerable evidence concerning this issue was introduced at trial, the district court denied recovery on this claim.

At the close of trial, the district court concluded that ADDS had breached its warranties contained in the sales contracts governing the Regent 100 terminals that it sold to CDT. The court ruled that the purported limitation on remedies contained in the distributorship agreement did not absolve ADDS from either direct or consequential damages stemming from this breach. The court also found that ADDS had negligently designed and sold the Regent 100 line of terminals, fraudulently representing that they were "inherently reliable" while knowing that the Regent terminals it had already sold were experiencing operational problems. Finally, the court ruled that ADDS, by submitting its second, lower bid to Intel, tortiously interfered with CDT's economic relationship with Intel. *Consolidated Data Terminals v. Applied Digital Data Systems, Inc.,* 512 F.Supp. 581, 586–87 (N.D.Cal.1981).

By way of damages, the court found that CDT had incurred $15,000.00 in expenses and lost sales time because of the services it had provided customers who had bought defective Regent terminals. The court also concluded that ADDS's breaches of warranty caused the termination of the ADDS–CDT distributorship agreement. Absent the Regent controversy, the court reasoned, CDT would have continued to realize profits through 1980 on sales of ADDS products. Therefore, the court awarded the projected profits on these sales as consequential damages in the amount of $11,842.50. Further, the court refused to deduct profits earned by CDT on sales of Hazeltine and Televideo equipment between 1978 and 1980 in miti-

gation of these damages, since it found that this equipment was not "in actuality" competitive with ADDS terminals. Next, the court found that CDT would have realized a profit of $266 on each of the 127 terminals it should have sold to Intel, and awarded $28,702.00 in compensatory tort damages. Finally, the court found that ADDS's "fraudulent conduct and wrongful interference with CDT's advantageous economic relationship with Intel was in knowing and conscious disregard of CDT's rights and interests," and awarded CDT punitive damages of $500,000.00. *Id.* at 587–88.

From the total liability of $655,544.50 imposed upon ADDS, the court subtracted $70,054.89 to satisfy ADDS's counterclaim. The district court accordingly entered judgment for CDT in the amount of $585,489.61.

Pursuant to Federal Rule of Civil Procedure 59(a), ADDS filed a motion requesting the district court to amend its judgment. ADDS specifically objected to the finding of liability for tortious interference, arguing that a business is always free to "interfere" with negotiations of a competitor by lowering its bid. The district court responded by entering an amended finding that an actual contract had been formed between CDT and Intel before ADDS lowered its bid on the 127 Regent terminals. It ruled that since "competition" for the bid had already ended when ADDS submitted its revised bid, the submission constituted an unlawful interference with contract.

■ ADDS appeals from this ruling and from the original judgment of the district court.[3] CDT cross-appeals from the dis-

The new fraud claim introduced by CDT during trial was distinct, since it related not to alleged misrepresentations concerning the distributorship agreement, but to misrepresentations concerning specific CRT's sold by ADDS to CDT.

**3.** As a threshold question, we must consider what law applies to the various issues in this diversity action. For purposes of this inquiry, we apply the choice of law rules of California, the forum state. Under California law, the intention of the parties to apply New York law to the contract would be permitted to govern; therefore, we apply New York law to all of the contract issues in this case. *See Seidman &*

*Seidman v. Wolfson,* 50 Cal.App.3d 826, 831, 123 Cal.Rptr. 873, 876 (1975) (court applied New York law to govern contract containing choice of law provision quite similar to choice of law provision contained in the ADDS–CDT contract). Other issues in this case, which involve tort law and the law of punitive damages, are not controlled by the contract choice of law provision. California law requires an analysis of the interests of states involved to determine the law that most appropriately applies to each issue. *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 316, 546 P.2d 719, 720, 128 Cal.Rptr. 215, 216–17 (1976); *Hurtado v. Superior Court,* 11 Cal.3d 574, 580–81, 522 P.2d 666, 669, 114 Cal.

missal of its claim for breach of covenant of good faith and fair dealing.

## DISCUSSION

### A. *Breach of Warranty.*

██ The evidence adduced at trial revealed no substantial dispute concerning the quality of the Regent 100 terminals sold by ADDS to CDT. The terminals were poorly designed, and failed to perform according to specifications. The specifications represented that the Regent 100's would operate at a speed of 19,200 baud; because CDT relied on the specifications when ordering the terminals, this statement constituted an express warranty.[4] In fact, none of the terminals ever operated at 19,200 baud, and the specification on the terminal was ultimately reduced to 1,900 baud, less than one-tenth the speed originally promised. This by itself supports the district court's conclusion that ADDS breached a warranty covering the Regent 100 terminals it sold. We affirm that ruling.

ADDS contends that even if the Regent 100's failed to perform as promised, the warranty disclaimer clause incorporated into each Regent 100 contract negatives any other ADDS promise contained in oral or written descriptions of the goods or in promotional literature. Paragraph 6 of the "Terms and Conditions" incorporated into

each terminal sale states that "ADDS makes no warranty, express or implied,"[5] other than a ninety-day guarantee covering materials and workmanship. We do not need to consider whether the Regent problems constituted defects in "materials" or "workmanship" because we conclude that the disclaimer cannot be permitted to override the highly particularized warranty created by the specifications.

██ Where a contract includes both specific warranty language and a general disclaimer of warranty liability, the former prevails over the latter where the two cannot be reasonably reconciled. N.Y. U.C.C. § 2–316(1) (McKinney's 1964). According to the New York Court of Appeals,

> An attempt to both warrant and refuse to warrant goods creates an ambiguity which can only be resolved by making one term yield to the other .... Section 2–316 (subd. [1]) of the Uniform Commercial Code provides that warranty language prevails over the disclaimer, if the two cannot be reasonably reconciled.

*Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 405, 244 N.E.2d 685, 689, 297 N.Y.S.2d 108, 113 (1968) (citation omitted). Thus, we conclude that the express statements warranting that the Regent 100's would perform at a 19,200 baud rate prevail over the general warranty dis-

---

Rptr. 106, 109 (1974). Because most of the statements and events that gave rise to this case occurred in California, one party is a resident of California, and California is the forum state, the district court correctly concluded that California interests predominate and that California law should govern all non-contractual issues in this case.

4. N.Y. U.C.C. § 2–313(1)(a) (McKinney's 1964) defines an express warranty to include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."

5. The provision stated in full that:
 6. WARRANTY
 ADDS warrants each new communications and terminal product manufactured by it to be free from defects in material and workmanship under normal use and service for a period of 90 days from the date of shipment. ADDS' sole obligation under this warranty is limited to making good, at its factory, any

product or any part or parts thereof found to be defective, provided the buyer bears the cost of shipping charges in connection with the repair or replacement of the defective equipment.
ADDS MAKES NO WARRANTY, EXPRESS OR IMPLIED; AND ANY IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE WHICH EXCEEDS THE FOREGOING WARRANTY IS HEREBY DISCLAIMED BY ADDS AND EXCLUDED FROM ANY AGREEMENT MADE BY ACCEPTANCE OF ANY ORDER PURSUANT TO THIS AGREEMENT. ADDS will not be liable for any consequential damages, loss or expense arising in connection with the use of or the inability to use its products or goods for any purpose whatsoever. ADDS' maximum liability shall not in any case exceed the contract price for the products.

claimer, and properly formed the basis for CDT's breach of warranty action.

### B. *Contractual Limitation on Remedies.*

The contract term governing CDT's warranty rights (quoted in note 5, above) contained two important limitations: (1) the buyer's remedies were restricted to repair of the defective equipment, and (2) the recovery of certain consequential damages was excluded. ADDS contends that each of these limitations should preclude CDT from recovering contract damages in this case.

■■■ Turning first to the remedy limitation, we conclude that it does not restrict ADDS's liability in this case because it did not leave CDT with any effective remedy.[6] Despite ADDS's good faith efforts to correct the continuing problems with the Regent 100 terminals, none of the terminals ever operated at the rate of 19,200 baud as warranted. In this situation, the remedy limitation was negated by N.Y. U.C.C. § 2–719(2) (McKinney's 1964), which states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." Where warranted goods fail to perform according to specifications as warranted despite the seller's efforts to repair, a limited "repair" remedy fails of its essential purpose. *See S.M. Wilson & Co. v. Smith International, Inc.,* 587 F.2d 1363, 1375 (9th Cir.1978) (construing substantially identical California statute). For this reason, CDT is entitled to other remedies available for breach of contract under the New York U.C.C. *See Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 404, 244 N.E.2d 685, 688, 297 N.Y.S.2d 108, 113 (1968); *Stream v. Sportscar Salon, Ltd.,* 91 Misc.2d 99, 397 N.Y.S.2d 677, 683 (N.Y.Cir. Ct.1977).

■■ Among the breach of contract remedies ordinarily available to a buyer are incidental and consequential damages. N.Y. U.C.C. § 2–715 (McKinney's 1964). ADDS contends, however, that even if the remedy limitation does not apply, CDT should still be precluded from recovering consequential damages by the separate exclusion of such damages incorporated in the distributorship agreement. ADDS bases this argument on N.Y. U.C.C. § 2–719(3) (McKinney's 1964), which permits the exclusion of consequential damages unless unconscionable, and *S.M. Wilson & Co. v. Smith International, Inc.,* 587 F.2d 1363, in which this court held that recovery of consequential damages may be excluded even though a limited remedy fails of its essential purpose. We conclude that these authorities do not control the present case, because the contract did not in fact preclude recovery of the consequential damages suffered by CDT.

The limiting language incorporated in the contract was that "ADDS will not be liable for any consequential damages, loss or expense arising in connection with the use of or the inability to use its products or goods for any purpose whatsoever." As we read it, this provision does not exclude all consequential damages, but rather only such damages as result from loss of use of defective equipment. Under this provision, a buyer could not, for example, recover profits lost because of business impairment resulting from the inability to use a Regent 100 terminal for a period of time. The consequential damages suffered by CDT were of a wholly different nature, however. As discussed below, these damages consisted of a loss of customer goodwill resulting from CDT's sale of shoddy ADDS terminals, together with the expenses incurred by CDT in trying to recapture that goodwill. These consequential damages did not arise "in connection with the use of or the inabili-

---

**6.** CDT's contention that the remedy limitation should be disregarded ·because "unconscionable" within the meaning of N.Y. U.C.C. § 2–302 (McKinney's 1964) is meritless. A remedy limited to repair is not unconscionable per se. *See, e.g., J.D. Pavlak, Ltd. v. William Davies Co.,* 40 Ill.App.3d 1, 351 N.E.2d 243, 246 (1976). Also, the district court specifically found that

there was "no material disparity in bargaining power between ADDS and CDT" at the time the distributorship agreement was created. Unconscionability rarely exists in a commercial setting involving parties of equal bargaining power. 512 F.Supp. at 583. *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 509 F.2d 1043, 1048 (6th Cir.1975).

ty to use [ADDS] products or goods," but were instead caused by the wholesale failure of ADDS Regent terminals to operate properly and to conform to specifications. Since the contract did not exclude recovery of this type of consequential damages, it is unnecessary for us to consider whether under U.C.C. § 2–719(3) or the analysis of *S.M. Wilson & Co.* the failure of a limited remedy to achieve its essential purpose may vitiate an exclusion of recovery for consequential damages.[7]

C. *Measure of Damages.*

The district court awarded damages totalling $15,000 to CDT to cover "additional costs" caused by the problems with the Regent 100 terminals. In addition, the court awarded damages based on estimated profits on sales of ADDS products that CDT "lost" because the dispute precipitated the end of the ADDS–CDT distributorship agreement. The court ruled that the distributorship arrangement would have continued for three years after 1978, and that CDT would have earned net profits of $111,842.50 on sales of ADDS products during that period.[8] The court refused to deduct from this sum the net profits realized by CDT on sales of other products distributed in place of ADDS equipment. We sustain the district court's award of $15,000 as proper direct, incidental, and consequential damages, but reverse its additional award of $111,842.50.

The measure of damages under the U.C.C., which follows the common law of contracts, is straightforward:

The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

N.Y. U.C.C. § 2–714(2) (McKinney's 1964). N.Y. U.C.C. § 2–714(3) (McKinney's 1964), states that "[i]n a proper case any incidental and consequential damages under [U.C.C. § 2–715] may also be recovered." N.Y. U.C.C. § 2–715 (McKinney's 1964) provides that

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expenses incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

Under these rules CDT was entitled to recover as direct damages the difference

**7.** Under the view we take in this case, we likewise find it unnecessary to consider whether the final clause of the warranty limitation, that "ADDS' maximum liability should not in any case exceed the contract price for its products," should be given effect. The $15,000 in damages that we allow under the contract is less than the contract price of the Regent 100 terminals that failed to meet specifications.

**8.** The court concluded that

16. ADDS is liable for the damages its negligent design, introduction and sale of the Regents and its fraudulent conduct in regard to the Regents caused CDT in additional costs. The Court finds these costs to be $15,000.00. In addition, the Court finds that a reasonable

time for the duration of the agreement to be three years rather than five. The Court further finds that CDT's projected sales for the year 1978 must be reduced by the amount of actual sales. CDT projected sales of $289,-350.00 for the year 1978. This figure must be reduced by the actual sales of $103,125.00 or $186,225.00. Therefore, the net profit for the year 1978 which was not achieved would be $18,622.50. This is derived from Williams' testimony that CDT's profit margin was 10% of sales. The Court finds that the CDT's loss of profits for the years 1978–1980 inclusive, to be $111,842.50, for which ADDS is liable. 512 F.Supp. at 587.

in value between the Regent 100 terminals as warranted and as delivered. As incidental damages, CDT could recover all reasonable expenses it incurred in inspecting, shipping, handling and storing the defective Regent units. As consequential damages, CDT could recover all losses that ADDS had reason to know CDT would incur as a result of a wholesale breach of warranty on the Regent units. Knowing that CDT was a distributor of computer equipment, ADDS had reason to know that if it supplied poor quality merchandise that failed to conform to product specifications, CDT would suffer a loss of goodwill with its customers because the customers would blame CDT for the product failures, and would become more reluctant to buy equipment from CDT in the future.

Testimony at trial indicated that many of CDT's customers were quite unhappy about the Regent 100 terminals, and that CDT devoted considerable time and expense to an effort to placate these customers. However, the district court did not find that CDT was forced to make price concessions to its customers on the Regent 100 terminals it sold. Thus, CDT established no "direct" damages within the meaning of section 2–714(2). The court did find that "[t]he Regent defects caused CDT to incur $15,000 in additional costs and lost profits because of the numerous service calls which they necessitated," and it awarded this $15,-000 to CDT as damages. We uphold this award as properly measured incidental and consequential damages pursuant to section 2–715.

■ The district court awarded an additional $111,842.50 based on a much more unusual theory of consequential damages. It ruled that because CDT chose to end the distributorship agreement as a joint result of the defects in the Regent 100 CRT's and ADDS's interference with its Intel contract,

CDT was entitled to recover the profits it would have realized had the distributorship arrangement continued. We seriously doubt whether these damages were a sufficiently foreseeable result of a breach of warranty to be recoverable as consequential damages. See N.Y. U.C.C. § 2–715(2)(a) (McKinney's 1964); *Kornblut v. Chevron Oil Co.,* 62 A.D.2d 831, 407 N.Y.S.2d 498, 502–03 (A.D.1978); *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng.Rep. 145 (1854). We need not reach this issue, however, because CDT did not in fact sustain any lost profits on ADDS equipment sales as a result of either the breach of warranty or the interference with contract.

■ First, the district court's findings specifically state that CDT voluntarily stopped selling ADDS products in July, 1978, following the disputed Intel transaction. CDT was not forced to take this action because of a loss of goodwill among its customers caused by problems with Regent 100 terminals. Instead, the findings imply that CDT chose to end the distributorship so it could be free to deal in the products of Hazeltine, an ADDS competitor.[9] Profits "lost" from a completely voluntary and independent business decision are not "caused" in a legally cognizable sense by conduct that merely supplies some contributing factors underlying the decision. See *Transamerican Mercantile Corp. v. Western Union Telegraph Co.,* 156 N.Y. S.2d 201, 205–06 (N.Y.Civ.Ct.1955).

Moreover, CDT did not in fact lose any profits as a result of the termination of the ADDS distributorship agreement. The district court concluded that CDT would have realized $111,842.50 on ADDS equipment sales by taking 10 percent of the estimated sales CDT would have made between 1978 and 1980. During the same period, CDT entered distributorship agreements with

---

9. The district court found that

32. CDT finally stopped selling ADDS products completely in July 1978 following the Intel transaction because of the continuing problems with the Regents, ADDS' failure to provide leads, ADDS' competition in all aspects of the market, ADDS' failure to proper-

ly motivate its salesmen to aid distributors and ADDS' conduct in the Intel transaction. CDT entered at that time into an agreement to distribute Hazeltine products to replace the ADDS line of terminals which it had stopped selling.

512 F.Supp. at 585–86.

both Hazeltine and Televideo. Applying the same 10 percent formula to CDT's actual and estimated sales of these products,[10] CDT should have realized profits of $123,250 on sales of $1,232,500. CDT would not have been permitted to sell Hazeltine or Televideo products under the ADDS distributorship agreement, since ADDS deemed the products of both firms to be "competitive."[11] Therefore, CDT (according to the court's formula) realized estimated profits of $123,250.00 as a result of the termination of the ADDS contract; this more than offset the $111,842.50 that the court estimated CDT lost due to the termination. The cancellation of the distributorship agreement did not cause CDT to lose any profits, and the lower court should not have awarded any damages for such "losses" in this case.

## D. *Tort Liability Issues.*

In addition to its conclusion that ADDS breached its warranties covering the Regent 100 terminals, the district court ruled that ADDS was guilty of fraudulent misrepresentation respecting those terminals. Also, it ultimately ruled that ADDS tortiously interfered with CDT's contract with Intel. We conclude that ADDS was denied a fair trial as to these issues because each issue was introduced by an extremely late change in the pleadings and neither was tried by consent. ADDS sought a continuance which was taken under advisement by

the court until after the trial was completed. This in effect constituted a denial of the motion for continuance and prevented ADDS from having an adequate opportunity to respond to the changed pleadings. For this reason, we must remand these issues for a new trial.

### 1. *Fraud.*

CDT's original complaint presented six causes of action. Among these claims was only one that alleged fraud. The gravamen of this claim was that ADDS, by falsely promising to supply CDT with sales leads and marketing assistance, fraudulently induced CDT to enter the distributorship agreement. Concerning the substandard quality of the Regent 100 computer terminals, CDT alleged only a breach of contract cause of action. CDT's pretrial statement did not mention fraud at all.[12] On the third day of the four-day bench trial, CDT introduced a pleading amendment that for the first time alleged that ADDS had fraudulently misrepresented the capabilities of the Regent 100 line of terminals. The court allowed CDT to so amend its pleadings. ADDS now challenges the amendment, contending that it was introduced and allowed so late that ADDS did not have a fair opportunity to contest CDT's fraud allegation. CDT argues that because some evidence relevant to its new fraud claim was

10. *See supra* note 1.

11. The district court found that "neither the Hazeltine products nor the Televideo products were competitive in price or in actuality with the ADDS' products during the years 1978–1980, inclusive." 512 F.Supp. at 587–88. This finding, however, was not determinative of the contract issue, because paragraph 3 of the distributorship agreement prohibited CDT from acting as sales agent for any other CRT product "*deemed by ADDS* to be competitive with ADDS equipment" (emphasis added). Since ADDS deemed the Hazeltine and Televideo products to be competitive, CDT was prohibited from dealing in those products under the agreement, regardless of whether the products were "competitive" with ADDS products under some objective test.

12. In its pretrial statement, CDT summarized its claims as follows:

(a) Defendant Applied Digital Data Systems, Inc. [ADDS] breached a contract pursuant to which CDT became a distributor of its products, including Regent 100 and 200 cathode ray tube terminals, by providing such defective products that CDT was ultimately rendered unable to market ADDS' products and by competing with CDT for sales of ADDS' products in a manner inconsistent with the contract, thereby depriving CDT of its reasonably expected profits under the contract. (b) ADDS interferred [sic] with CDT's prospective economic relationship with Intel Corporation by depriving CDT of a sale to that corporation by using means which were inconsistent with the distributorship relationship between CDT and ADDS. (c) CDT is also seeking recovery for the damages it suffered as a result of ADDS providing it with defective products.

introduced at trial without objection from ADDS, the fraud issue was tried by consent, and the district court's allowance of the pleading amendment and subsequent judgment of liability on the issue were proper.

█ Federal Rule of Civil Procedure 15(b) embodies a liberal policy in favor of allowing pleading amendments at any time during and even after trial. Also, even if the pleadings are never amended, the rule allows a judgment on an issue to stand if the issue has been tried by express or implied consent. However, late pleading amendments are improper under the rule if they cause substantial prejudice to the opposing party. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *United States v. 47 Bottles, More or Less*, 320 F.2d 564, 573 (3d Cir.1963). *See also William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1053 (9th Cir.1981) (party may be permitted to alter legal theory through late pleading amendments only if other party is not prejudiced in its defense upon the merits).

Under the circumstances of the present case, where the pleading amendment was allowed after the purportedly relevant evidence had already been admitted, the question whether the defendant was prejudiced by the amendment is no different from the question whether the issue introduced by the amendment was tried by consent. As we have observed in *Cole v. Layrite Products Co.*, 439 F.2d 958, 961 (9th Cir.1971), the purpose of pleading amendments under the second sentence of Federal Rule 15(b) is to "align the pleadings to conform to issues actually tried." The rule does not permit amendments to include issues which may be "inferentially suggested by incidental evidence in the record." *See also Gonzalez v. United States*, 589 F.2d 465, 470 (9th Cir. 1979); *MBI Motor Co. v. Lotus/East, Inc.*, 506 F.2d 709, 711 (6th Cir.1974); *Bettes v. Stonewall*, 480 F.2d 92, 94–95 (5th Cir.1973); *Standard Title Insurance Co. v. Roberts*, 349 F.2d 613, 620 (8th Cir.1965). An adverse party cannot be expected to object to

the introduction of evidence that is only tangentially related to the issues actually pleaded prior to trial unless the party has notice that the evidence is being introduced as proof on some other unpleaded issue. *See* 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1493, at 466–67 (1971).

█ Our review of the record convinces us that ADDS suffered substantial prejudice as a result of the pleading amendment that introduced the fraud cause of action. Under California law, fraud in the sale of substandard equipment is established when a seller knowingly makes a misrepresentation with an intent to induce reliance, and justifiable reliance results, causing damage to the plaintiff. *See, e.g., Glovatorium, Inc. v. NCR Corp.*, 684 F.2d 658, 660 (9th Cir.1982). Thus, the significant factual issue for purposes of CDT's fraud claim was whether ADDS knew that its statements concerning the Regent 100 terminals were false at the time they were made. ADDS had no notice of CDT's intent to pursue this issue, and thus no reason to object to evidence bearing on the issue. ADDS's knowledge of the defect had but marginal relevancy to the question whether the terminals failed to perform as warranted. Under the original pleadings and pretrial statement, the evidence was of no importance. While trial by consent might properly be found in other situations where evidence irrelevant to the pleadings is introduced, in this case the trial transcript demonstrates that ADDS did not know CDT would seek to assert its fraud claim until the time of the motion to amend. Had ADDS been aware that its knowledge of the Regent defects would be an important issue in the case, it would have elicited testimony concerning that topic from its witnesses, and might have called additional witnesses. The one remaining day of trial following the amendment did not afford the defendant an adequate opportunity to defend against the new fraud claim. Had the district court granted ADDS's request for a continuance, the prejudice to ADDS from the surprise pleading amendment might have been cured. *See Robbins v. Jordan,*

181 F.2d 793, 795 (D.C.Cir.1950). But the district court in effect denied the motion by reserving its ruling on both the amendment and the continuance request until the end of trial, when it allowed the amendment. The lateness of CDT's pleading amendment, coupled with the denial of ADDS's motion for a continuance, thus caused substantial prejudice to ADDS's defense.[13] *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1053 n. 68 (9th Cir.1981); *Browning Debenture Holders' v. DASA Corp.,* 560 F.2d 1078, 1086 (2d Cir.1977); 3 J. Moore, *Moore's Federal Practice* ¶ 15.13(2), at 15–173 (1978 supp. to 2d ed. 1966).

The Sixth Circuit dealt with a situation similar to the one presented here in *MBI Motor Co. v. Lotus/East, Inc.,* 506 F.2d 709 (6th Cir.1974). In that case, the defendant was a nationwide distributor of Lotus automobiles, and the plaintiff was a local Lotus dealer. Four Lotuses sold by the defendant to the plaintiff developed substantial mechanical defects that required repeated servicing by the plaintiff. *Id.* at 710. The plaintiff's complaint represented the converse of CDT's in the present case; it alleged misrepresentation by the defendant but not a breach of warranty. *Id.* The pretrial order likewise did not mention a breach of warranty theory. At the close of the bench trial, the district judge ruled that the defendant had not misrepresented the nature and vintage of the automobiles. However, he concluded that the issue of warranty liability had been tried by implied consent, and allowed the plaintiff to recover

for breach of warranty pursuant to Federal Rule 15(b). *Id.* at 710–11.

The Sixth Circuit Court of Appeals reversed. The court acknowledged that Rule 15(b) allows recovery on a theory tried fully by the parties, even though not set forth in the pleadings or in the pretrial order. *Id.* at 711 (citing *Dering v. Williams,* 378 F.2d 417 (9th Cir.1967)). But it held that a trial court may not "base its decision upon an issue that was tried inadvertently." *Id.* It concluded that the evidence on which the district court based its warranty decision, while relevant to that issue, had been introduced for the purpose of proving misrepresentation. Finding that the defendant never consented to trial of the unpleaded warranty issue, the court ruled that the defendant had lacked an opportunity to counter the new theory, and reversed the judgment. *Id.* at 713. A similar result is required here. As the court observed in *MBI Motor Co.,* "[i]mplied consent to the trial of an unpleaded issue is not established merely because evidence relevant to that issue was introduced without objection. At least it must appear that the parties understood the evidence to be aimed at the unpleaded issue." 506 F.2d at 711.

We conclude that we must vacate the district court's judgment on the fraud issue and remand for retrial on that issue. *See MBI Motor Co.,* 506 F.2d at 713.[14]

**2. *Interference with Contract.***

■ Turning to the district court's award of $28,702 for tortious interference with contract, we find that a similar analy-

---

**13.** Had the district court granted ADDS's request for a continuance, the prejudice to ADDS from the surprise pleading amendment might have been cured. *See Robbins v. Jordan,* 181 F.2d 793, 795 (D.C.Cir.1950). But the district court in effect denied the motion by reserving its ruling on both the amendment and the continuance request until the end of trial, when it allowed the amendment.

**14.** CDT will be entitled to prevail on remand if it can establish the elements of fraud or negligent misrepresentation under California law. We note, however, that the practical significance of the issue may be limited to deciding whether CDT is entitled to recover punitive

damages. We have already ruled that CDT was correctly permitted to recover full compensatory damages on a contract theory. Although the "out-of-pocket" measure of damages for fraud under California law is different from the contract "benefit-of-the-bargain" measure, *see* Cal.Civ.Code § 3343 (West supp. 1982); *Stout v. Turney,* 22 Cal.3d 718, 725, 586 P.2d 1228, 1232, 150 Cal.Rptr. 637, 641 (1978), the record contains no basis for supposing that CDT could recover additional compensatory damages for the Regent 100 defects in the Regent 100's under a tort theory beyond those we have upheld under a breach of warranty theory.

sis applies. CDT's complaint did not allege that ADDS had interfered with a CDT-Intel contract; rather, it alleged that ADDS had interfered with CDT's prospective business advantage in connection with the Intel transaction. Nor did CDT's pretrial statement mention inducement to breach a contract. Instead, it stated CDT's theory to be that "ADDS interfered with CDT's prospective economic relationship with Intel Corporation by depriving CDT of a sale to that corporation by using means which were inconsistent with the distributorship relationship between CDT and ADDS." [15] The district court rendered its initial judgment in favor of CDT on this basis. On a Rule 59 motion to alter or amend judgment, ADDS argued that the liability imposed for interference with prospective business advantage could not stand, because ADDS, like any competitor, was privileged to submit a sales offer to Intel at any time prior to the formation of a binding contract between Intel and CDT. The district court, in its supplemental findings and conclusions entered in response to CDT's motion, agreed with this reasoning. However, for the first time it found that a contract between CDT and Intel *had* been formed prior to the submission of ADDS's second bid, and that the submission of that bid constituted a tortious interference with contract. 512 F.Supp. at 589.

Because the interference with contract theory was not pleaded and was not tried by consent as required by Federal Rule 15(b), we conclude that the district court's judgment on this issue cannot stand. The evidence at trial focused primarily upon ADDS's pricing policies and the question whether ADDS's second bid breached some express or implied obligation not to engage in price cutting running from ADDS to CDT.[16] By contrast, the parties never appear to have focused upon the question whether a binding contract between CDT and Intel ever existed. For example, CDT called as a witness Steve Abreu, Intel's purchasing agent, who would presumably have been in the best position of any nonparty to testify concerning the existence of such a contract. Yet Abreu was not asked anything about the existence of a contract; instead the questioning focused upon whether or not Intel could properly be classified as an original equipment manufacturer of computers. The only testimony cited by CDT to support its contention that the interference with contract issue was tried by consent was that of Douglas Cole, CDT's own salesman.[17] This testimony is not sufficient to show that the question whether a CDT-Intel contract existed was fully tried by consent. We conclude that ADDS never

15. *See supra* note 12.

16. According to CDT, ADDS customarily maintained three sets of prices. The highest prices were quoted by ADDS to "end-users" of computer equipment. A discount was given to distributors such as CDT who resold ADDS products to end-users. An even larger discount (resulting in the lowest prices) was offered by ADDS to original equipment manufacturers (OEM's) who purchased direct from ADDS. ADDS lowered its second Intel bid because it reclassified Intel from an "end-user" to an "OEM." Much of the trial was devoted to an exploration of the propriety of this reclassification in light of what CDT contended was an obligation assumed by ADDS to adhere to its fixed schedule of prices.

We find this evidence to have been completely irrelevant to the validity of an interference with contract claim.

17. CDT cited the following:

Q. (CDT's counsel) Did you get a response to this letter that you are looking at, exhibit 7?
A. (Cole) Yes.
Q. What response did you get?
A. I got a phone call from Steve Abreu telling me I had won the bid for all the terminals and he congratulated me.
Q. Following that conversation, did you take any action in connection with that transaction?
A. Sure, I jumped for joy. I thought it was one of the best sales I had ever made in my career, and I let my superiors at CDT know exactly what happened, and they were all happy and we started ordering equipment.

. . . . .

Q. (Cross-examination by ADDS's counsel) When you say you were awarded the bid, what do you mean?
A. (Cole) We had the order.
Q. Did you get a purchase order, a hard copy?
A. The hard copy was on its way.

received a proper opportunity to contest the existence of the contract, and therefore suffered substantial prejudice as a result of the district court's post-trial ruling premised upon Rule 15(b). We conclude that we must reverse the district court's judgment on the interference with contract issue, and must remand for retrial to determine whether a valid contract between CDT and Intel was ever formed, and if so, whether ADDS tortiously interfered with that contract.[18]

### E. *Punitive Damages.*

 The district court awarded CDT $500,000 in punitive damages based on ADDS's fraud and tortious interference with contract. Because we vacate and remand the judgment on both of these issues, we must vacate and remand the award of punitive damages as well. Punitive damages are not available under California law for mere breaches of contract, no matter how gross or willful. Cal.Civ.Code § 3294(a) (West Supp.1982); *Miller v. National American Life Insurance Co. of California,* 54 Cal.App.3d 331, 336–37, 126 Cal. Rptr. 731, 733 (1976). Without tort liability, the punitive damages award cannot stand. If CDT upon remand can establish that ADDS was guilty of fraud, malice, or oppression within the meaning of section 3294(a), then the district court may award punitive damages upon that basis in such amount as shall seem reasonably appropriate. *See, e.g., Glovatorium, Inc. v. NCR Corp.,* 684 F.2d 658, 664 (9th Cir.1982).

### F. *Covenant of Good Faith and Fair Dealing.*

 The second cause of action listed in CDT's complaint asserted a claim in tort for breach of the covenant of good faith and fair dealing inherent in the ADDS–CDT distributorship agreement. In response to ADDS's pretrial motion, District Judge Spencer Williams dismissed this cause of action. CDT now cross-appeals from that dismissal.

We affirm this ruling. While the California Supreme Court has stated that an implied covenant of good faith and fair dealing exists in "every contract," *Bleecher v. Conte,* 29 Cal.3d 345, 350, 626 P.2d 1051, 1053, 173 Cal.Rptr. 278, 280 (1981), it has discussed tort liability on this theory only in connection with breaches of insurance and employment contracts, where a special fiduciary duty runs between the parties. *See, e.g., Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 179 n. 12, 610 P.2d 1330, 1337 n. 12, 164 Cal.Rptr. 839, 846 n. 12 (1980); *Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 818, 620 P.2d 141, 145, 169 Cal. Rptr. 691, 695 (1979). A California court recently reversed a trial court's decision imposing such tort liability upon a party who breached a commercial contract, where the "dominant purpose" of the contract was to obtain "commercial advantage" and the contract involved "no particular aspect of protection against mental distress, no special relationship giving rise to public policy or public interest considerations and no lack of balance in the contractual relationship as is characteristic in contracts of adhesion." *Seamen's Direct Buying Service v. Stan-*

---

**18.** To prevail, CDT will have to show that such a contract existed. The theory asserted by CDT at trial in reliance upon an alleged price agreement was insufficient as a matter of California law to establish tortious interference with prospective business advantage. The freedom to negotiate and to attempt to underbid a competitor is an integral part of American economic life, and therefore a "competition" privilege to interfere with the prospective business advantages of others in this way should always be upheld. In the recent case of *Los Angeles Airways, Inc. v. Davis,* 687 F.2d 321, 325 (9th Cir.1982), decided under California law, we recognized that the existence and scope of such a privilege is determined by reference to the societal interests it is designed to protect. *See also Winn v. McCulloch Corp.,* 60 Cal.App.3d 663, 673, 131 Cal.Rptr. 597, 602 (1976). Here, society is certainly concerned with ensuring vigorous competition to promote the most efficient possible allocation of resources, goods and services. Furthermore, the type of pricing arrangement urged by CDT as the basis for its tort action offends the spirit if not the letter of the antitrust laws. Under these circumstances, only the existence of a binding contract creates a countervailing societal interest that may overcome ADDS's competitive justification.

*dard Oil Co. of California,* 129 Cal.App.3d 416, 432, 181 Cal.Rptr. 126, 135 (1982). In the absence of further guidance from California courts concerning the scope of this potentially expansive new theory of tort liability, we conclude that District Judge Williams was justified in dismissing CDT's claim for breach of the covenant of good faith and fair dealing.[19]

### CONCLUSION

The judgment of the district court is affirmed insofar as it awarded CDT $15,-000.00 in direct, incidental, and consequential damages for ADDS's breach of warranty with respect to the Regent 100 terminals. The award of $111,842.50 to compensate CDT for profits on ADDS terminals it would have sold had not the distributorship agreement been terminated is vacated. The award of $70,054.89 to ADDS on its counterclaim has not been challenged by CDT on this appeal.

The district court's judgment for CDT on its fraud and tortious interference with contract claims is vacated and remanded for retrial, along with the $28,702.00 and $500,-000.00 awards for interference and punitive damages. On remand, the district court should allow such additional pleadings by both parties as are necessary to flesh out their claims and defenses on these issues, and such additional discovery as it deems necessary prior to trial on those claims and defenses. *See United States v. Hardy,* 368 F.2d 191, 192 (10th Cir.1966).

AFFIRMED in part, REVERSED in part, and REMANDED in part.

---

**19.** We accord District Judge Williams deference in his ruling that no cause of action under California law was stated for breach of the covenant of good faith and fair dealing, as an interpretation of state law in the state in which he normally sits. *See Insurance Co. of North America v. Howard,* 679 F.2d 147, 150 (9th

Cir.1982). We have accorded no such deference to the trial judge's rulings in the case, however, since that judge was from the Southern District of Alabama and was sitting only by designation. *See Safeco Ins. Co. of America v. Guyton,* 692 F.2d 551, 554 (9th Cir.1982).